**SAN FRANCISCO NAACP, et al., Plaintiffs,**

v.

**SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al., Defendants.**

**Civ. No. C–78–1445 WHO.**

United States District Court, N.D. California.

May 20, 1983.

Thomas I. Atkins, Gen. Counsel, NAACP, Brooklyn Heights, N.Y., Peter Graham Cohn, NAACP—Western Region, Eva Jefferson Paterson, San Francisco Lawyers Committee for Urban Affairs, San Francisco, Cal., for plaintiffs.

Aubrey V. McCutcheon, Jr., Detroit, Mich., Corrine Lee, Asst. Legal Advisor, San Francisco Unified School Dist., San Francisco, Cal., for local defendants.

John Van DeKamp, Atty. Gen., John Davidson, Deputy Atty. Gen., Barry A. Zo-

lotar, Asst. Chief Counsel, San Francisco, Cal., for state defendants.

## OPINION AND ORDER

ORRICK, District Judge.

This school desegregation case, brought by the San Francisco Branch of the National Association for the Advancement of Colored People ("NAACP"), a civil rights organization representing its members, and individual black parents proceeding on behalf of their own children, charges that the defendants, the San Francisco Unified School District, its Board Members, and its Superintendent (hereinafter collectively called "the District"), and the California State Board of Education and its members, the State Superintendent of Public Instruction, and the State Department of Education (hereinafter collectively called "the State"), engage in discriminatory practices and maintain a segregated school system in the City and County of San Francisco in violation of the Constitution and laws of the United States and of the State of California.[1] Plaintiffs also bring this action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of all children of

school age who are or may in the future become eligible to attend the public schools of the District [2] and also who are entitled to do so under circumstances that afford them full and equal protection of the law. The case is now before the Court for a ruling determining whether the proposed Consent Decree ("the Decree"), annexed hereto as Exhibit A, is a fair, reasonable, and adequate resolution of the claims raised by the pleadings in this unique lawsuit.[3]

For the reasons hereinafter set forth, the Court holds that the Decree submitted is indeed fair, reasonable, and adequate and, given the extraordinary conditions under which it was negotiated, is unique. Accordingly, the Court orders the District and the State forthwith to implement the Decree according to its terms, including the schedules of important events set forth in the Decree itself.

### I

To understand and to interpret the Decree one must have some insight into the enormous effort exerted not only by the parties themselves, principally through their able counsel, but also by the best experts on desegregation in the country,

---

1. Specifically, plaintiffs filed suit under the First, Ninth, Thirteenth, and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §§ 1981 and 1983, and unspecified sections under the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, and the Constitution of the State of California.

2. The Court has determined that the class, so defined, comports with the requirements of Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. The class consisted of approximately 60,000 students at the time the suit was filed, a number so large as to render joinder of each class member in a single suit impractical. The principal questions of fact and law—whether the defendants engaged in practices that perpetuated a racially segregated school system, and whether they manifested the necessary segregative intent to be held responsible for such segregation—are common to each member of the class. The claims of the named class representatives, that they have been denied equal educational opportunities by the effects of racial segregation in the District, are typical of the claims of all other class members. The named class representatives have adequately represented the class, in that they themselves are members of the class, their experienced counsel have

prosecuted the class' common claims to a successful conclusion, and no interests antagonistic to other class members have arisen during the settlement of the suit. Finally, defendants were alleged to have acted on grounds generally applicable to the entire class, rendering injunctive and declaratory relief with respect to the whole class appropriate. Accordingly, the Court has found that the plaintiff class is properly certified under Rule 23(b)(2).

3. Parenthetically, one might note the coincidence of this Court's inquiry into the fairness and adequacy of the Decree, and the report recently issued by the President's Task Force on Education concluding that the education of America's youth is mediocre at best and spiraling downward at worst. In making its determination, the Court strives to discern in this Decree that educational purpose so cogently enunciated by James Bryant Conant, a former President of Harvard University, that "our purpose is to cultivate in the largest number of our future citizens an appreciation of both the responsibilities and the benefits that come to them because they are Americans and are free."

and by one of the top law firms in the country, Wilmer, Cutler & Pickering of Washington, D.C. Of equal or greater importance, one must remember the major goal of the Decree: to eliminate racial/ethnic segregation or identifiability in any District school program or class and to achieve throughout the system the broadest practicable distribution of students from nine racial and ethnic groups—Spanish-surnamed (comprising 17.2% of the general student population of the District), Other White (16.9%), Black (23.1%), Chinese (19.5%), Japanese (1.1%), Korean (1.0%), Filipino (8.7%), American Indian (0.6%), and Other Nonwhite (11.9%). The Court's determination of the fairness and adequacy of this proposal is complicated by the lack of guidance by higher courts considering similarly diverse school districts.

The *sine qua non* of the Decree is the agreement of the District to ensure *this* coming school year (1983–84) that no single racial/ethnic group shall comprise more than 45 percent of the enrollment at any school.

The evaluation of the fairness and adequacy of a consent decree can best be made against the backdrop of the entire litigation leading to its formulation. Against this backdrop, one may ascertain whether, given all the conditions existing at the time of negotiations, the bargain struck was indeed fair, reasonable, and adequate.

## A

Here, the plaintiffs listed a series of specific practices or policies by which the defendants purportedly perpetuated the dual school system: constructing new schools and annexes, leasing private property for school use, and utilizing portable classrooms in order to incorporate extant residential segregation into the District; establishing feeder patterns, transfer and reassignment policies, optional and mandatory attendance zones to situate children in racially isolated schools; implementing racially discriminatory testing procedures, disciplinary policies, and tracking systems within schools and classrooms; hiring and assigning faculty and administrative personnel, and allocating financial resources in a discriminatory manner. Plaintiffs sought by way of relief a declaratory judgment and preliminary and permanent injunctions guaranteeing them equal education opportunity and fully desegregated schools under a court-ordered desegregation plan.[4]

The parties immediately embarked upon a lengthy period of extensive discovery and trial preparation that, until the filing of the proposed consent decree on the eve of trial, consumed the better part of four and a half years. During this period, the Court convened twenty-five pretrial hearings to consider motions and to remain apprised of the status of the case. The parties exchanged seven sets of interrogatories, nine requests for admissions, and ten requests for documents, and compiled numerous volumes of deposition testimony. Plaintiffs alone assembled three thousand exhibits for trial.

The parties filed three important pretrial motions during this period of discovery

---

**4.** This litigation is the third in a series of actions brought on behalf of minority students in the public schools in San Francisco. One action, *O'Neil v. San Francisco Unified School District*, No. C–72–0808 RFP (N.D.Cal., filed May 5, 1972), was brought on behalf of black secondary school students and was voluntarily dismissed without prejudice in 1976. The principal prior case, *Johnson v. San Francisco Unified School District*, 339 F.Supp. 1315 (N.D.Cal.1971), was filed on behalf of black elementary school students in June 1969, and resulted in a finding of *de jure* segregation and the issuance of an injunction requiring implementation of a plan to desegregate the District's elementary schools. The Ninth Circuit reversed the *Johnson* decision

on the issue of liability in 1974, 500 F.2d 349, but directed the District to continue to comply with the desegregation plan ordered by the trial court pending the outcome of anticipated hearings and/or modification of the trial court decision. In 1978, the trial court *sua sponte* dismissed the *Johnson* action without prejudice for mootness and failure to prosecute.

This action is broader in scope than the *Johnson* case in that it involves allegations of *de jure* discrimination in secondary as well as elementary schools, involves alleged discrimination by the State as well as local officials, and seeks relief for a class of all San Francisco public students, rather than a class solely of black students.

that served to sharpen the issues for trial and precipitate the instant proposed settlement decree. On April 13, 1979, the State defendants filed a motion for dismissal or abstention. Defendants argued in part that the Court should not decide the "unsettled" issue of state law concerning the apportionment of policy-making powers between state and local authorities. Defendants argued in the alternative that plenary authority for establishing education policy, and primary responsibility for implementing such policy, rests with the state legislature and local school districts, respectively, and not with the defendant state agencies. The Court rejected these arguments and denied defendants' motion in a written decision filed on September 18, 1979. In that decision, the Court declined to abstain, principally because relevant California law was sufficiently clear to suggest an appropriate resolution of the issues presented. Additionally, the Court reviewed the applicable state constitutional and statutory provisions, the state court interpretive rulings thereon, and the relevant federal authorities, and concluded that the State defendants may be made to bear responsibility for the alleged segregative practices of the District.

On February 15, 1980, the District filed a motion for separate trial on the issue of whether, as of the filing of the instant complaint, they were operating a dual school system in violation of plaintiffs' constitutional rights. Defendants argued in that motion that the convenience of the parties and the Court would be served by examining first in a separate trial the adequacy of the desegregation plan ordered in prior litigation and continuously implemented (with amendments) by the defendants through the proceedings in this action. Defendants maintained that if the "Education Redesign" plan adequately eliminated past acts of segregation, intentional or unintentional, there would be no basis for the Court to order additional relief, even if defendants' liability for past segregative acts could be established. The Court denied the District's motion for separate trial in a hearing on September 24, 1981, but

adopted its suggestion by directing the parties to offer first at a single trial proof of the current conditions of segregation in the District as of the filing of the complaint.

On June 6, 1980, while defendants' motion for a separate trial was still pending, plaintiffs filed a 206 page motion and supporting memorandum for partial summary judgment on the issue of whether, as of 1954 and 1970, the District was racially segregated as to a substantial portion of its facilities, programs, student enrollments, and personnel. The memorandum traced the history of *de jure* segregation in the District from the establishment of "colored schools" and "Chinese schools" in the 1850's to the segregation of the housing industry during the 1940's and 1950's. The memorandum also identified numerous instances of alleged discriminatory decision making *inter alia* in the selection of school sites, the establishment of student attendance zones and feeder patterns, the assignment of faculty and administrators, and the administration of achievement tests and discipline, from which the Court purportedly could draw the inference that the defendants intended to segregate the District. The Court, finding that plaintiffs had failed to establish the core of their case—the existence of a dual system as of 1954—and that they had failed to assert a sufficient number of undisputed facts to create an inference of segregative intent, denied plaintiffs' motion for partial summary judgment in an Order and Memorandum filed June 30, 1981.

Plaintiffs' motion, though unsuccessful initially, proved to be a critical point in the course leading to settlement of the suit. In the process of ruling on plaintiff's motion, the Court determined that numerous factual assertions made by plaintiffs were uncontested by defendants, and that these assertions should serve as stipulated facts for purposes of trial. The Court summarized these facts in an appendix to its Memorandum. Additionally, in order to aid the parties in their preparation for trial and for possible settlement negotiations, the Court commented on certain factual deficiencies

in plaintiffs' case (particularly concerning discrimination against minority groups other than Blacks) as well as areas (such as faculty and administrative hiring and placement) in which plaintiffs were factually strong and likely to prevail at trial. These findings and comments [5] produced the desired effect of promoting discussions among the parties concerning a possible settlement of the action.

### B

Settlement discussions took place privately among the parties during the next nine months while they continued upon the Court's instructions to prepare in earnest for trial. In April 1982 a three-day series of settlement conferences was commenced, between the Court and the plaintiffs on the first day, the Court and defendants on the second day, and among the Court and all parties on the third day. During these conferences the parties advised the Court that, except for current conditions at certain schools in the Bayview/Hunter's Point area of the city, there was no serious impediment to settlement of the action. The Court suggested the appointment of a settlement team composed of the nation's leading experts on school desegregation and education policy to resolve these difficulties. The parties readily agreed.

Accordingly, by order filed May 7, 1982, the Court appointed eight persons pursuant to Federal Rule of Evidence 706 to serve as expert witnesses for the purpose of reviewing plans for settlement and making recommendations to the Court and the parties. The Court designated Professor Harold Howe II and Professor Gary A. Orfield, two of the best educators in the country, to co-chair the settlement team.[6] Professors Howe and Orfield both have had extensive experience in desegregation cases and with

the courts. The remainder of the team consisted of two designees of the plaintiffs, Professor Gordon Foster and Professor Robert L. Green; two designees of the District, Ms. Barbara Cohen and Mr. Fred C. Leonard; and two designees of the State, Dr. Ples A. Griffin and Dr. Thomas M. Griffin. In order to provide a basis for the settlement team discussions, the parties were directed to submit memoranda setting forth in detail the precise nature of their dispute concerning conditions at the Bayview/Hunter's Point schools specifically, and at other schools elsewhere in the District more generally. The parties were directed to include in their memoranda as well their current plans and/or alternate proposals for achieving complete desegregation within the school system. The Court scheduled a meeting among the settlement team, the litigation group, and the Court in early June, after team members had had an opportunity to review the parties' memoranda, in order for the team to make initial recommendations to the Court and to the parties regarding the prospects for settlement. The settlement team was to deliberate in confidence, outside the presence of counsel, and the co-chairmen were to act as sole spokespersons for the team.

All parties agreed that the prospects for settlement were promising and that the settlement team should confer privately to address the problems delineated in the parties' settlement conference memoranda. The team co-chairmen assigned projects to individual team members who were to develop written solutions that could be incorporated into a comprehensive desegregation plan. The Court advised the parties that the trial date scheduled for February 1983 would not be changed and that, in the

---

**5.** The Court did not intend by these comments, however, to prejudge or to render a ruling on the merits on any of the issues set for trial.

**6.** · A list of the Settlement Team members and a partial summary of their credentials is contained in Exhibit B to this Opinion. The members of the Settlement Team contributed services of inestimable worth to the District, for

which services they richly deserve the appreciation of every resident of San Francisco. They brought their talents and their experience to bear on problems unique to the ethnic diversity of this City and created practical solutions that will enrich the education of generations of San Francisco school children.

meantime, counsel for the parties were to continue to prepare for trial.

After several intermediate meetings, including one conference with the Court and the litigation group on August 11, the settlement team met at the courthouse on September 22 and 23 to assemble and draft a final proposal. The team members, with exceptional diligence, resolved most of their differences during the short time remaining for their deliberations. The fruit of their labor, a final settlement team agreement, was delivered to the parties at a meeting of the litigation group the next day. Though a few areas of dispute remained, the parties agreed that the draft agreement did provide them with a framework on which they could work, and all were confident that a final accord was imminent. The parties were dispatched to draft a consent decree.

By December 9, the parties had drafted large portions of a proposed consent decree, although they remained far apart with respect to a few key provisions. At a status conference held on that day, it became apparent to the Court that the parties shared a common conception as to how the desegregation plan should function, but that they could not agree as to how to reduce that conception to writing. Accordingly, with the consent of the parties, the Court appointed the Washington, D.C. firm of Wilmer, Cutler & Pickering to assist in drafting the final decree. The parties submitted the Decree to the Court on December 30.

The Court convened a hearing that afternoon in accordance with Section 1.46 of the Manual for Complex Litigation. At the hearing, the Court made a preliminary determination that the proposed consent decree is fair, reasonable and adequate, and ordered that notice be given to the absentee class members and to the public in the form proposed in Appendix C of the decree.[7] The Court scheduled a public hearing on the fairness of the decree for February 14, 1983.

The fairness hearing was held as scheduled on February 14. During the hearing, the Court heard a number of comments, both laudatory and critical, from the public.[8] At the conclusion of the hearing, the Court took the public comments under consideration, and reserved judgment as to whether the Decree is fair, reasonable, and adequate until after it had the opportunity to study the comments in connection with briefs submitted by counsel at the end of March.

II

The Decree presented by the parties to the Court may be summarized as follows:

A. *Student Desegregation*

The consent decree recognizes nine racial or ethnic groups in the District for purposes of implementing a comprehensive desegregation plan: Spanish-surnamed, Other White, Black, Chinese, Japanese, Korean, Filipino, American Indian, and other Non-White. The key objective of the student desegregation plan is to eliminate racial/ethnic segregation or identifiability in any school, classroom, or program, and to achieve throughout the system, the broadest practicable distribution of students from all the racial/ethnic groups comprising the general student population. Regular schools are to enroll students from no fewer than four of the nine racial/ethnic groups identified above, and are to ensure

---

**7.** The Court and the parties subsequently amended the notice provisions of the Decree by Stipulation and Order filed January 20, 1983, to extend the time during which the public could file with the court written objections to the proposed Decree. The parties published notice of the settlement and the Fairness Hearing in the following publications on the following dates in addition to those publications and dates listed in the decree at paragraph 52, page 25: *Asian Week* on February 3, 1983; *Chinese Pacif-*

*ic Weekly* on January 27 and February 3, 1983; *East West* (Chinese American Journal) on January 26 and February 2, 1983; *The Filipino American* on February 4, 1983; and *Tiempo Latino* (in English and Spanish) on January 19 and January 26, 1983.

**8.** The proceedings and the comments at the Fairness Hearing are described in greater detail in section V, infra.

that no more than 45 percent of their enrollments are comprised of students from any one race or ethnic group. Specified alternative schools are to ensure that no more than 40 percent of their enrollments are made up of students from a single racial/ethnic group.

These goals are to be achieved, beginning in the fall of 1983, by assigning, reassigning, and transferring students, and by adjusting the composition of the entering class at each noncomplying school such that no more than 40 percent of the entering students will be from one racial/ethnic group. The District must revise attendance zones and provide transportation as needed to accomplish these desegregation goals. Optional attendance zones drawing students from isolated areas will be used only as a means of achieving desegregation. The District will be free, however, to use magnet or alternative schools or programs to help meet the goals of the Decree.

The Decree identifies nineteen historically segregated schools for special desegregation treatment. As of September 1983, the maximum number of students at these schools from the dominant racial/ethnic group must be reduced to a designated percentage of the student enrollments, generally between 37 percent and 44.9 percent.

The Decree also sets forth a special plan to convert the elementary and middle schools in the Bayview/Hunter's·Point area into magnet schools or special schools with enriched programs. Under the plan, the Dr. Charles R. Drew School is to be converted in an academic middle school with increased counseling to help prepare its graduates for the Lowell High School program. The programs at Dr. George Washington Carver School will be enhanced academically and students for these programs will be drawn from a newly developed mandatory attendance area. The programs at Sir Francis Drake School will be enriched as well, with an emphasis placed on computer service instruction. Students will be assigned to the Drake School programs from a newly established attendance area.

Pelton Middle School is to be converted into the new San Francisco Academic High School and the curriculum and programs at this new Academic High School are to be modeled after those currently offered at Raoul Wollenberg High School.

In recognition of the flexibility needed to desegregate the Bayview/Hunter's Point Schools and the significance of the reorganization effort contemplated, the Decree authorizes the District specially to select personnel to staff and restaff these schools.

Additionally, the decree contains a plan to dispel negative public stereotypes, concerning the schools at Bayview/Hunter's Point. As part of that plan, the District must publish and distribute to parents of all school-aged children in the District a description of the new programs to be developed at the four Bayview/Hunter's Point Schools. The District also must engage a reputable public relations firm to promote the neighborhood generally and the programs at the schools more specifically.

Finally, the student desegregation element of the Decree contains two provisions designed to curtail practices which have exacerbated the problem of racial concentration in the District. Under the first provision, the State must warn suburban school districts that they will receive no state aid for students residing in San Francisco whose interdistrict transfers adversely affect San Francisco's school desegregation effort. Under the second provision, the parties will make a joint request to the appropriate military authorities that they cease transporting children from military bases to private schools.

### B. *Desegregation of Faculty, Administrators, and Other Staff*

The Decree requires the District at the earliest practicable date to implement its policy of assuring that the racial/ethnic composition of the full-time faculty, administrators, and other staff of the District reflects that of the District's student enrollment. The Decree also requires the

District to assure the equitable distribution of staff throughout the District.

### C. *Staff Development*

Under the terms of the Decree, the District must develop, in consultation with the State, a comprehensive plan and budget to address areas identified as essential for training staff in school districts undergoing desegregation.

### D. *Extra-Curricular Activities*

The Decree provides that the District, in consultation with the State, must develop and submit to the Court, a plan to monitor extra-curricular activities and to inform students of the equal access opportunities in this area.

### E. *School Discipline*

The Decree authorizes the parties to prepare a report to the Court on an appropriate Student Code of Conduct to assure fairness and consistency in the administration of school discipline.

### F. *Academic Excellence*

The Decree directs the District to monitor test scores and academic results in order to evaluate the continued effort to achieve academic excellence throughout the system.

### G. *Parent and Student Participation*

Under the Decree, the District must continue to encourage and improve participation by parent, students, staff, and other members of the community in developing programs for desegregation and academic excellence. The parties are authorized to submit further recommendations to the Court to assure adequate community representation in the implementation of the Decree.

### H. *Housing and Desegregation*

The Decree recognizes the critical impact of governmental housing policies on school segregation and establishes a plan by which the parties jointly will endeavor to persuade the appropriate federal, state, and local housing authorities to develop policies that will promote rather than impede desegregation efforts. According to the plan, the parties will request information from the various housing authorities concerning their current policies, and the location and population of existing subsidized housing. They then will retain an expert to analyze the data and make recommendations for conforming housing policy to school desegregation objectives. Finally, the parties will forward the expert's analysis and recommendations to appropriate local government officials. Under the plan, the parties' expert will file annual reports with the Court on the progress achieved conforming housing policy to school desegregation efforts, and the parties will report to the Court and to each other any changes in housing policy likely to have an adverse effect on school desegregation.

### I. *Reporting and Monitoring*

The Decree contemplates that the District Superintendent will report to the Court periodically for at least six years on compliance with the terms of the Decree and progress toward reaching its goals. The State Department of Education will review independently the District's compliance with the Decree and also report to the Court annually on its implementation.

### J. *The State Role in Financing the Plan*

The District will incur additional costs during the implementation of the relief ordered by this Decree. Such costs will be compensable by the State as the costs of complying with a court order. The State defendants will assist the District in obtaining reimbursement from the State.

### K. *Retention of Jurisdiction*

The Court will retain jurisdiction under the Decree to enforce its provisions, to receive progress reports, and to enter such additional orders as may be appropriate. After six years the defendants may move to terminate the Decree, which motion the Court will consider if the District has substantially complied with the Decree and the Decree's basic objectives have been achieved.

## III

### A

A district court in this Circuit is charged with procedural and substantive responsibilities in evaluating the propriety of a proposed class action settlement. The Ninth Circuit has summarized the Court's procedural obligations as follows:

"[T]he class must be notified of a proposed settlement in a manner that does not systematically leave any group without notice; the notice must indicate that a dissident can object to the settlement and to the definition of the class; each objection must be made part of the record; those members raising substantial objections must be afforded an opportunity to be heard with the assistance of privately retained counsel if so desired, and a reasoned response by the court on the record; and objections without substance and which are frivolous require only a statement on the record of the reasons for so considering the objection."

*Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 624 (9th Cir.1982), *citing Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835–36 (9th Cir.1976). The Court and the parties herein have abided by these procedural guidelines. As set forth in section IB, the Court directed the parties to notify the class of the proposed settlement at the preliminary hearing held on December 30. Notices of the proposed settlement were published in the two local newspapers of greatest circulation (the *San Francisco Chronicle* and the *San Francisco Examiner*) as well as in the primary newspapers of the ethnic communities comprising the class. *See Mendoza v. United States*, 623 F.2d 1338, 1351 (9th Cir.1980) (notice of proposed school desegregation settlement published in Spanish and English in two major newspapers was adequate under Federal Rule of Civil Procedure 23(e) and the Constitution of the United States). These notices advised class members of their right to file written objections to the proposed settlement and to appear at the fairness hearing personally or through counsel. The Court received comments from the public in writing in response to the notices and filed these written comments as part of the record. All persons raising objections to the proposed Decree were given the opportunity to be heard at the fairness hearing held on February 14, and most dissidents were in fact heard. The Court will respond to each of these comments in section IV, *infra.*

The substantive standard by which the Court is to evaluate a proposed settlement is simply stated, although it admits of no easy application: the Court must determine whether the settlement is "fundamentally fair, adequate, and reasonable." *Officers for Justice, supra,* 688 F.2d at 625. As a general rule in school desegregation cases, a proposed remedial plan is fair and adequate if it corrects the constitutional violations *found* and does so in a manner which does not infringe on the rights of others. *Mendoza, supra,* 623 F.2d at 1345. This case, however, is different from the typical school desegregation case: the plan herein is the result of a compromise among the parties prior to trial and before any constitutional violations have been proved. Accordingly, the Court must determine not only the extent to which the proposed Decree cures the violations *alleged,* but also the likelihood that further litigation would produce better results for the plaintiff class. This latter inquiry involves a balancing of several factors, including the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement. *Officers for Justice, supra,* 688 F.2d at 625. No single factor listed above is conclusive; the importance of the factors jointly or severally is dictated by the circumstances of the particular case. *Id.*

■ In representative suits of this nature, the Court must be particularly vigilant of the competing interests of individuals or groups within the class. Inevitably, some members of the class will not be as satisfied with the terms of a proposed settlement as others—this is an accepted structural risk of the class action device. *Mendoza, supra,* 623 F.2d at 1344. However, a potential injustice arises as the distribution of benefits and burdens in a class remedy becomes increasingly unequal, and a small minority of class members will not be asked to bear an unduly disproportionate share of the accompanying burdens. *Id.* Opposition by a significant number of class members to the proposed settlement is another factor to be considered in determining its fairness. *Mandujano, supra,* 541 F.2d at 837.

■ The district court's role in considering the adequacy of a proposed settlement is not without boundaries. Its intrusion upon what is otherwise a private consensual agreement[9] between the parties must be limited to a determination that the settlement taken as a whole is fair, reasonable, and adequate to all concerned and that it is not the product of fraud, overreaching, or collusion. *Officers for Justice, supra,* 688 F.2d at 625. In making this determination, the Court is not to reach any ultimate conclusion on the contested issues of fact and law that underline the merits of the dispute. *Id.* Additionally, the Court must bear in mind that voluntary conciliation and settlement are the preferred means of dispute resolution, particularly in complex class action litigation. *Id.*

With these standards in mind, the Court now turns to determination of the fairness and adequacy of the proposed Consent Decree before it.

**B**

■ The Court has witnessed the development of this case almost from its inception and has reviewed in detail the provisions of the proposed Consent Decree and the comments submitted by the public (which comments are addressed in the next section). The Court finds, for reasons set forth in this section, that the proposed Decree is fair, reasonable, and adequate.

The Decree effectively addresses the primary concern underlying this lawsuit: alleged racial segregation of students in San Francisco's schools. The Decree demands that immediate and definitive action be taken to reduce the concentration of students of one racial/ethnic group at all schools throughout the District. It imposes mandatory limitations (as contrasted to the current voluntary guidelines) on the percentage of students from one race or ethnic group that can attend each school—45 percent at regular schools, 40 percent at alternative schools—and requires each school to enroll a minimum of four racial/ethnic groups. Beginning *this year* (fall 1983), the District must assign, reassign, and transfer students such that no more than 40 percent of the entering class at noncomplying schools (*i.e.,* schools not within the above limitations) will be composed of the dominant racial/ethnic group. Thus, the Decree assures the complete desegregation of San Francisco's schools within the next few years.

In addition, the Decree amends, or affirms the District's efforts to amend, many of the policies and practices alleged to have contributed to a racially segregated school system. For example, plaintiffs have alleged that the District "manipulated" the use of school facilities—selected school sites, constructed new buildings and annexes, located portable "bungalow" classrooms, converted existing facilities—in a manner that promoted racial segregation. The proposed Decree requires the District to implement its current policy of avoiding facility utilization that disproportionately burdens any racial/ethnic group.

Plaintiffs claimed that the District promoted student transfer policies that had

---

**9.** The Court recognizes, however, that the agreement among these parties hardly can be deemed "private," notwithstanding the general rule recited in the text, in light of the scope of the proposed remedy and the nature of the interests involved.

the effect of increasing racial segregation within the District. The proposed Decree eliminates or modifies certain transfer devices by which students could avoid participating in the desegregation process. Thus, the Decree requires the State to discourage interdistrict transfer between the District and suburban school districts. Additionally, the decree lowers the "trigger point" above which Optional Enrollment Request transfers will not be permitted.

Plaintiffs alleged that the District established and maintained a system of citywide alternative schools that served to exclude minority students from their special programs and provided white students with a means of isolating themselves from minority children. The Decree promotes desegregation at these schools by placing a 40 percent cap on the percentage of any single racial/ethnic group that may attend them. Additionally, the Decree establishes a newcomer program at the newly constituted Drew Academic Middle School, which program is designed to increase minority representation at one of the premier high schools in the District, Lowell High School.

Plaintiffs claimed that the District tolerated and/or assisted military personnel in segregating their school children from minority students in the District. Under the Decree, the District will join plaintiffs in submitting to the appropriate military authorities a formal request to cease transporting children from military bases to private schools.

Plaintiffs alleged that the District hired and assigned teachers and administrators in a racially discriminatory manner. The Decree binds the District to its present staffing policy, designed "to achieve a staff at each school site and District location that will reflect the student population of the District."

On a related issue, plaintiffs alleged that faculty hired by the District possess racially prejudiced attitudes toward minority school children, which attitudes have had the effect of denying minority students equal educational opportunity. Under the Decree, the District, in consultation with the State, is to submit to the Court a comprehensive plan providing for up to six days per year of staff development on desegregation issues.

Plaintiffs identified residential segregation to be an acute problem in the City and charged the defendants with incorporating that segregation into the operation of the public school system. The Decree recognizes the link between housing policy and school segregation, and commits the parties to a specific procedure for analyzing the problem and forwarding recommendations to the appropriate local, state, and federal housing authorities. These provisions represent a novel approach to a problem of national proportions (*e.g.*, housing segregation) that has plagued the implementation of school desegregation plans in other cities.

Finally, plaintiffs charged defendants with deliberately excluding elementary and middle schools located in the Bayview/Hunter's Point area of the city from any efforts to desegregate the remainder of the District. The Decree deals extensively with the historic difficulties the District has encountered desegregating the schools at Bayview/Hunter's Point. It mandates specific programatic changes at these schools designed to enhance the quality of their curricula and to improve public perception of the entire area. These programs, carefully designed by the settlement team after consideration of a number of alternatives, offer great promise for full desegregation of the schools at Bayview/Hunter's Point.

In short, the proposed Decree addresses and resolves, without need of further litigation, many, if not most, of the concerns that prompted plaintiffs to file the suit initially. It should be stressed that the defendants have agreed to undertake the many responsibilities set forth in the Decree even though no constitutional violations on their part have been proved; they should be commended for their dedication to academic excellence and equal educational opportunity for all children in San Francisco.

The Court does not mean to suggest that plaintiffs have acquired by the Decree all that they might have obtained after a full trial. The Court suggests only that the Decree represents a reasonable compromise among the parties considering the risks that further litigation would entail for plaintiffs.

There is substantial risk, for example that plaintiffs would fail at trial to establish a crucial link between well-documented historical incidents of segregation and the District's policies and practices in the years immediately prior to and contemporaneous with the Supreme Court's decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Plaintiffs' proof of discrimination, primarily against black students in the Western Addition, *circa* 1954 is weak in several respects.[10] Plaintiffs rely heavily on a 1943 study of dubious validity[11] to demonstrate the racial composition of the Western Addition and surrounding schools during the 1940's and 1950's. Without the study, plaintiffs' assertion that defendants altered feeder patterns and grade structures, and gerrymandered attendance zones, in order to relieve overcrowded "black" schools without disturbing "white" schools is entirely unsupported. Furthermore, plaintiffs have produced no contemporary documentation concerning the feeder patterns utilized during the period in question (1945–1961). Instead, by a questionable methodology, they have "reverse interpolated" such documentation from a set of 1962 statistics. Further still, defendants have raised serious doubt as to whether any authoritative boundary maps had been produced prior to 1963. There is some chance then, stemming from these evidentiary weaknesses, that plaintiffs would not establish the keystone of their case: the existence of a dual school system as of 1954.

In the absence of convincing proof of a dual school system, plaintiffs would bear a significant burden establishing the remainder of their case. Without such proof, plaintiffs could not exploit the presumption of systemwide, continuing segregation described in the Columbus and Dayton cases;[12] they could not simply show that defendants had failed to meet their affirmative duty to dismantle the dual system. Instead, plaintiffs would be compelled to prove current (post 1954) incidents of *intentional* segregation.

Plaintiffs' showing in support of summary judgment suggests that this burden would not be borne easily. They relied largely on an analysis of the number of physical changes in facilities at "racially identifiable" schools from 1960–70 to demonstrate defendants' segregative intent during this period. Defendants, however, sufficiently cast doubt on the accuracy of plaintiffs' data on a number of these changes. Plaintiffs also relied heavily on an analysis of defendants' use of fourteen optional attendance zones during the 1940's through the 1960's to show segregative intent. However, their proof of the racial

**10.** The Court refers here to the evidence presented by plaintiffs in support of their motion for partial summary judgment.

**11.** The study largely relied upon by the plaintiffs is entitled "The Negro War Worker in San Francisco," a project financed by a San Francisco citizen, administered by the Y.W.C.A., and carried out in connection with the Race Relations Program of the American Missionary Association, Dr. Charles S. Johnson, Director, and the Jules Rosenwald Fund (May 1944). The document is of questionable reliability for several reasons: it does not adequately disclose the source of the racial statistics included therein, or how or when they were collected; it does not describe the methodology used to analyze these statistics; it contains no background information concerning the qualifications of its authors; it does not purport to be an official District census. Moreover, the statistics contained in the study have never been utilized by the District for any purpose, or by the NAACP, notwithstanding its prosecution of two previous lawsuits against the District.

**12.** *See Columbus Board of Education v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 541, 99 S.Ct. 2971, 2981, 61 L.Ed.2d 720 (1979). *See also Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 211, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1979).

characteristics of the neighborhoods affected by these zones was often weak or unavailable. Moreover, defendants offered racially neutral explanations for all but four of the zones described by plaintiffs.

Additionally, while this Court has determined that the State Board of Education and its governing members are proper party defendants to this suit (*see* Opinion and Order filed September 18, 1979), plaintiffs heretofore have produced very little evidence to support their theory of liability against the State defendants; they have produced little evidence that the State defendants intentionally acted to foster a dual system in San Francisco's public schools or failed to act to eliminate segregation with knowledge that their failure to act would permit the maintenance of such segregation.

All of this is not to say that plaintiffs could not have won their case; the Court has made no effort to discuss all of the relevant evidence adduced by plaintiffs thus far. The Court suggests only that the risks of further litigation for the plaintiff class are very real.

Substantial risk inheres as well in the possible fragmentation of the plaintiff class during trial. As a phenomenon unique to the District, the plaintiff class consists of at least four and as many as nine distinct racial/ethnic groups. Plaintiffs have produced little or no evidence of discrimination against any racial/ethnic group other than Blacks. Recognizing the unique challenge plaintiffs' counsel has faced representing such diverse interests, the Court may have been constrained during trial to create subclasses of students and to appoint additional counsel to develop the factual record with respect to these subclasses.[13] Some plaintiffs who will enjoy the fruits of the Decree may have been dismissed from the suit for want of a showing of any constitutional violation against them. The interests of the remaining plaintiffs may have diverged during the remedy stage of the proceedings as each subclass competed for relief tailored to their specific concerns. Yet the sum of the specific benefits obtained by these subclasses may have been less than the whole of the comprehensive relief conferred upon all the class members by the Decree. Thus, the risks of maintaining class status throughout the trial are substantial.

In addition to the strategic risks discussed above, the complexity and duration of a trial would seriously diminish the value of whatever additional relief might be obtained by further litigation. The trial of this matter was expected to last three to five months. Plaintiffs alone planned to call a minimum of forty-three witnesses and to introduce approximately three thousand exhibits *during the liability stage of the trial.* Defendants collectively were expected to summon half again as many witnesses and produce approximately one hundred twenty-five exhibits to rebut the evidence introduced by plaintiffs. The expense and burden to which all parties and the Court would have been put is inestimable, but clearly the costs to the parties would have run into the hundreds of thousands of dollars. A lengthy trial of this nature and a possible court-imposed (as contrasted to privately negotiated) desegregation plan would have a potentially divisive effect on the community. For all the time, expense, and anxiety generated by a trial, it is unlikely that this Court would be any better situated, or any more competent, than it is now to design a fair and adequate plan.

The parties' decision to settle the case is based on the fullest information available. The settlement came on the eve of trial after more than four and a half years of pretrial preparation. The parties have completed extensive, liberal discovery and are thoroughly familiar with the strengths and weaknesses of their respective cases. The Court is satisfied that the proposed Decree represents a reasoned and well-in-

---

**13.** It should be noted, however, that counsel's representation of all members of the class to date has been superb.

formed compromise by experienced counsel.

The experience of one of the parties and of counsel in this suit lends great support to a finding that the Decree is fair and adequate. Plaintiff San Francisco NAACP is a charter member of the oldest existing civil rights organization in the country, an organization that is largely, if not wholly, responsible for the cause of action on which this very suit is founded.[14] Mr. Thomas I. Atkins, plaintiffs' lead counsel, and other members of his team, have participated in suits to desegregate the schools of twenty-nine cities located in ten states, including the State of California.[15] Lead counsel for the District, Mr. Aubrey V. McCutcheon, Jr., has been involved in the efforts to desegregate schools in ten cities.[16] These counsel bring to their decision to settle this suit via the proposed Decree considerable knowledge of the strengths and pitfalls of school desegregation litigation and of the relief typically awarded in such cases.

The fairness and adequacy of the Decree is further supported by the involvement of a bipartisan team of specialists drawn from around the country to study the unique features of this District and to make specific recommendations. The Court could have found no better expert counsel had this case proceeded through trial and had the Court been charged with the responsibility of fashioning an adequate remedy.

Finally, response from class members and from the public to the proposed Decree for the most part has been favorable. Not one person addressing the court at the fairness hearing suggested that the Court should not approve the proposed settlement.

### IV

The Court convened a fairness hearing on February 14, 1983, to provide class members and the public with an opportunity to comment on the fairness and adequacy of the proposed Decree. The Court instructed those individuals with comments to file written statements with the Court prior to the hearing and to direct their comments toward specific provisions of the Decree. Twenty-nine groups or individuals submitted written comments to the Court, and of that number, twenty-three groups or individuals elected to speak at the hearing. A number of speakers commended the efforts of the parties and championed specific provisions of the Decree. While, as noted above, the Court finds these comments to be a useful measure of the fairness of the Decree, it does not address them in this section. A number of speakers also expressed some concerns about the implementation of the Decree. The Court notes these concerns with interest for future reference, but again, it does not address them in this section. The Court herein focuses its response on objections to specific provisions or plans contained in the Decree.

The Court received the greatest number of objections from parents in the Bayview/Hunter's Point area concerning the plans to convert the Dr. Charles R. Drew School from an elementary school into an academic middle school, and to convert the Pelton Middle School into an alternative academic high school. Representatives for

---

**14.** The NAACP, of course, successfully prosecuted *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), bringing to an end the era of constitutionally sanctioned *de jure* segregation in the nation's schools.

**15.** Plaintiffs' counsel have participated in desegregation suits in the following states and cities: *California:* Long Beach, Los Angeles, Sacramento, San Bernadino, San Diego, San Francisco, Santa Barbara, Stockton; *Illinois:* Chicago; *Indiana:* Hammond, Indianapolis, South Bend; *Massachusetts:* Boston; *Michigan:* Benton Harbor, Detroit, Kalamazoo; *Missouri:* St. Louis; *New York:* Buffalo, New York City, Yonkers; *Ohio:* Alliance, Cincinnati, Cleveland, Columbus, Dayton, Lorain, Youngstown; *Texas:* Dallas; *Wisconsin:* Milwaukee.

**16.** Mr. McCutcheon has had some involvement in desegregation cases in the following states and cities: *Connecticut:* Bridgeport, Hartford, New Britain, New Haven, Wallingford; *Illinois:* Centralia, Chicago; *Michigan:* Detroit; *Missouri:* St. Louis; *New York:* Buffalo.

parents resisting changes at Drew School argued that the innovative, open-pod-style structure at that school is unsuited for conversion to a middle school facility and that other schools in the area have classroom configurations better suited to a middle school curriculum. Additionally, they argued that no comparable elementary school exists in the area and that their children would be "displaced" to other schools outside the area. Representatives for parents resisting change at the Pelton School argued essentially that the community takes pride in the academic achievements occurring at Pelton and feels that their children are receiving a superior education that would be lost if Pelton were converted into an academic high school.

No section of the Decree was subject to more intense scrutiny and consideration by the parties than the desegregation and educational enhancement of the Bayview/Hunter's Point schools. Historically, these schools have endured the greatest amount of racial concentration and popular contempt in the District. The changes mandated by the Decree are the product of recommendations by (without overstatement) the best local, state, and national desegregation/education specialists available. These experts, after considerable study, have concluded that comprehensive changes in the academic programs at Bayview/Hunter's Point are absolutely essential to the revitalization and enhancement of education for children of all races/ethnic groups in San Francisco. The experts concluded that such changes are necessary as well to counter negative perceptions of the neighborhood that otherwise would defeat any hope for desegregation.

While the Court sympathizes with the concerns of the parents at Drew and Pelton Schools, it must defer to the opinion of the experts that the program changes at these schools will benefit children throughout the District. The Court's responsibility is to the class of all children in San Francisco's schools, and in fulfilling that responsibility, it must examine the fairness and adequacy of the proposed plan as a whole. For reasons given previously, the Court believes that the plan, viewed as a whole, is a good one. The Court understands that the children at Drew School and Pelton School to some extent are being asked to make sacrifices, but it believes that the changes mandated by the Decree ultimately will redound to their benefit, as well as to the collective benefit of every child in San Francisco. The Court commends the children and the parents for their achievements at Drew School and Pelton School, and hopes that they similarly will endeavor to make the newly-formed academic middle school and high school successful.

A representative for the Mexican American Legal Defense and Educational Fund ("MALDEF") and for a parent of two Hispanic students, apparently focusing on the special provisions for the Bayview/Hunter's Point Schools, argued that the Decree addressed only the specific needs of black students in San Francisco, and that it fails to address the need for equal educational opportunities for Hispanic students as well.

The objection reflects a basic misunderstanding about the nature of this lawsuit and the objective of the Decree. This is a school desegregation action, and the gravamen of plaintiffs' claim is the alleged unlawful racial segregation of children in the District. The remedy sought and the remedy proposed is systemwide desegregation. This is *not* an action to establish an entitlement to a certain standard of academic excellence or to a right to certain programs to meet specific needs.

The Decree before this Court embodies a plan to achieve a fully desegregated school system, including all schools, programs, and classrooms. This plan is designed to provide relief for *all* San Francisco school children; it does not address the needs of any particular racial or ethnic group. In addition to the relief provided at the Bayview/Hunter's Point Schools, the Decree requires by September, 1983, a reduction in the percentage of students from the dominant racial/ethnic group in all other historically segregated schools in the District, including nine "Hispanic" schools, five

"Chinese" schools, and five "Black" schools. This requirement is an example of the comprehensive nature of the proposed remedy.

The special desegregation relief fashioned for the Bayview/Hunter's Point Schools is not relief developed solely for the purpose of meeting black students' needs.[17] This relief was specially developed to desegregate the most racially isolated area in the District, in schools that had proved to be the most resistant to previous desegregation efforts. It is in fact this very notion that Bayview/Hunter's Point schools are "black" schools that the special desegregation plans are designed to alter. All children, including Hispanic children, throughout the District will be eligible to participate in some of the newly enriched educational programs offered at Bayview/Hunter's Point.

MALDEF's contention that the proposed Decree does not address the educational needs of Hispanic children is simply incorrect. To the extent that all children, particularly minority children, benefit from a desegregated classroom environment, and to the extent that all children will be eligible for enrollment at the new academic middle school and high school at Bayview/Hunter's Point, the Decree does address the needs of Hispanic students.

■ Finally, there is no requirement that a desegregation decree address separately the specific educational needs of every racial/ethnic group comprising the plaintiff class. In this case, such a requirement would necessitate the creation of as many as nine separate plans.

The MALDEF representative also argued, based on the alleged failure of the Decree to address Hispanic needs, that Hispanic school children should be permitted to "opt" out of the plaintiff class, or in the alternative, that the Court should certify a subclass of Hispanic students.

The Court finds that neither of these proposals is warranted in this case. The plaintiff class is certified pursuant to Federal Rule of Civil Procedure 23(b)(2), which provision does not accord any member of the class the option to exclude himself from the suit. Hispanic students received all of the process, including proper notice at the time of settlement, that they were due under the federal rules. The Court does not believe that there is any need to create a subclass of Hispanic students. The Decree demands the complete desegregation of the District; a class of Hispanic students filing suit separately could not obtain any fuller desegregation relief than that mandated by this Decree. Conversely, the effectiveness of the present remedy for all children would be diminished considerably if Hispanic children, constituting 17 percent of the District's student population, were permitted to withdraw from the comprehensive plan contained in the Decree.

One speaker at the hearing questioned the ability of plaintiffs' counsel adequately to represent all the racial/ethnic groups comprising the plaintiff class. The Court finds that plaintiffs' counsel throughout the litigation represented the interests of all class members in an exemplary fashion. All of the class members sought as a common objective the complete desegregation of the District, and plaintiffs' counsel has served that common objective well.

Representatives from two teachers' unions, the San Francisco Classroom Teachers Association ("CTA") and the American Federation of Teachers ("AFT"), expressed concern at the hearing that some provisions in the Decree pertaining to restaffing at the Bayview/Hunter's Point Schools, to staff integration and to staff development, might be construed to alter defendants' obligations under their collective bargaining agreements with the unions. The CTA sought to add to the Decree a provision to the effect that defendants will continue to honor their agreements. The Court does

---

17. Initially, one should note that not all of the District's black students reside in Bayview/Hunter's Point. Conversely, not all of

those families living in Bayview/Hunter's Point and sending their children to the neighborhood schools are Black.

not believe that such a provision in the Decree is necessary. The Court has been assured by the parties that they will continue to recognize defendants' contractual obligations, and that teachers and other staff will share in the implementation of the Decree.

Several speakers at the hearing questioned the fairness of setting specific limitations on the percentage of students of one ethnic group at nineteen specially designated schools and suggested that these schools should be treated like all others in the District. The parties found that this special attention is warranted because of the historically high level of racial concentration present at these schools. The specific limitations mandated by the Decree reflect a joint assessment by the parties of what level of racial concentration is tolerable for desegregation purposes and what can be achieved in the short period available for implementation of the Decree. The Court finds that the special provisions for the nineteen designated schools are a reasonable response to special circumstances, and that no one group will be unduly burdened by them.

A number of persons addressing the Court at the hearing sought not to amend or abolish existing provisions in the Decree, but to "flesh out" certain provisions or to propose additional programs for the desegregation plan. These individual speakers suggested that the Decree establish citizen's advisory committees or parent/student councils at each school site to insure community input into the desegregation process; that it set forth specific terms for a uniform disciplinary code; that it lengthen the school day at the Bayview/Hunter's Point Schools; that it require the compilation of additional data to aid the Court in monitoring the plan; that it establish a K–8 magnet school on Treasure Island; that it provide for academic enhancement at Mission area schools; that it provide for more bilingual programs and teachers; that it require desegregation of classrooms as well as schools. Many of these suggestions are good ones, but the fact that they are not now part of the Decree does not render it inadequate. This Decree purports to be nothing more than a framework for desegregation that will be greatly enhanced by input from others, including members of the community. The details for insuring academic excellence as well as full desegregation in every school, classroom, and program will be developed during the implementation of the Decree. The Court is satisfied that the parties are committed to considering and incorporating valuable suggestions made by speakers at the fairness hearing. The present framework, however, is fair and adequate to redress the constitutional violations charged in plaintiffs' complaint. The role of the Court in these proceedings is limited to just that inquiry. This Court is not the local superintendent of public schools or the state superintendent of public instruction, and it cannot substitute its judgment of what constitutes a good academic program for that of these elected officials.

Finally, a number of speakers urged the Court to take an active role in monitoring the implementation of this Decree and perhaps to appoint a special master to assist it in this task.

The Court at this time has no intention of appointing a special master to monitor the implementation of the Decree. The Court has great confidence in Superintendent Alioto and the members of the Board of Education. Should this confidence prove to be misplaced, should the District violate any part of the Decree, the Court could, and probably would, at that time appoint a special master.

V

For the reasons set forth above, the Court finds that the proposed Decree is fair, reasonable, and adequate. Accordingly

IT IS HEREBY ORDERED that the parties immediately begin its implementation.

CONSENT DECREE

1. The Complaint in this cause, filed June 30, 1978, alleges that Defendants

have engaged in discriminatory practices and maintained a segregated school system in the City and County of San Francisco in violation of the constitutions and laws of the United States and of the State of California. The Complaint seeks the desegregation of the public schools of San Francisco, and the conversion of the San Francisco Unified School District (S.F.U.S.D.) into a unitary system in compliance with the Constitutions of the United States and of California and applicable federal and state statutes.

2. Plaintiffs are individual Black parents, proceeding on behalf of their own children, and the San Francisco branch of the NAACP, a civil rights organization which represents its members. Plaintiffs also bring this action, pursuant to Fed.R. Civ.P. 23, on behalf of a class composed of all children of school age who are, or may in the future become, eligible to attend the public schools of the S.F.U.S.D., and who are entitled to do so under circumstances which afford them full and equal protection of the laws.

3. Defendants are (a) the S.F.U.S.D., its Board Members and its Superintendent (hereinafter collectively called the "S.F.U. S.D."), the entity and officials created and/or empowered by the State of California to carry out public education functions, in compliance with State law, within the City and County of San Francisco; and (b) the California State Board of Education and its members, the State Superintendent of Public Instruction, and the State Department of Education (hereinafter collectively called the "State Defendants"), the entities and officials created and/or empowered by the Constitution and laws of California to carry out the State's system of compulsory public education, including the performance of certain regulatory, supervisory, advisory and oversight functions with respect to local school districts, including the S.F.U. S.D.

4. This Court has jurisdiction over this action and over the parties. This Court has pendent jurisdiction over Plaintiffs' claims under the Constitution and laws of the State of California, including Title 5, chapter 7 of the California Administrative Code. State Defendants concede jurisdiction for purposes of this case only. Venue is properly laid in this Court.

5. The parties have conducted extensive discovery, including numerous depositions and interrogatories and document discovery. The Court has denied motions of the State Defendants for a more definite statement and for dismissal and/or abstention, and a motion of the S.F.U.S.D. for a separate trial on certain issues. The Court has also denied the motion of Plaintiffs for partial summary judgment. In denying that motion, the Court made findings of fact with respect to some of the allegations of segregation in the S.F.U.S.D. schools. Those findings are set forth in an Appendix to the Court's Order of June 26, 1981, and are incorporated in this decree by reference.

6. At the direction and with the assistance of the Court, the parties have sought to reach a fair and equitable settlement of their differences for the benefit of the children of San Francisco. In the early summer of 1982, the Court and the parties established a Settlement Team, comprised of representatives of the parties and independent co-chairs, named by the Court, to consider the issues in dispute between the parties and to recommend a framework for addressing them. The work of the Settlement Team and the negotiations between the parties in the fall of 1982 have resulted in the agreement set forth herein. As the Settlement Team observed, the S.F.U.S.D. has made significant progress both in desegregation and in educational improvement since the 1971 order of this Court in *Johnson v. San Francisco Unified School District*, 339 F.Supp. 1315 (N.D.Cal.1971), *vacated*, 500 F.2d 349 (9th Cir.1974). The agreement reflected in this Consent Decree is intended to build on these efforts, to address the remaining problems flowing from racial/ethnic concentration, and to assure continued implementation of Educational Redesign as improved by this Consent Decree.

7. The parties, as indicated by the signature of their counsel below, have determined to settle this action, with the Court's approval, through entry of this Consent Decree, which the parties believe will benefit the children of San Francisco, conserve the resources and time of the parties and the Court, permit educational authorities to devote their attention to sound educational planning and programming, maximize the amount of state and federal financial assistance available to assist S.F.U.S.D. to meet its constitutional and statutory obligations, and serve the best interests of the parties themselves.

8. The parties stipulate and agree that, if proof were presented in formal proceedings, the Court would be justified in making factual findings and legal conclusions sufficient to require the systemwide remedies that are set forth in this Consent Decree.

9. The parties agree that this Consent Decree is final and binding as to the issues resolved herein.

10. In the event objections or challenges are raised to the lawfulness or appropriateness of this Consent Decree, or any provision hereof, or proceedings pursuant hereto, the parties shall defend the lawfulness and appropriateness of the matter challenged. If any such objection or challenge is made in a state court action, the parties shall remove such action to the United States District Court for the Northern District of California.

WHEREFORE, the parties having freely given their consent, the terms of the Decree being within the scope of the Complaint, and the terms of the Decree being fair, reasonable and adequate, it is hereby ORDERED, ADJUDGED, and DECREED:

# I

## CLASS CERTIFICATION

11. That the class of all children of school age who are, or may in the future become, eligible to attend the public schools of the S.F.U.S.D. is an appropriate class to maintain this action, and that the class is adequately represented by named plaintiffs.

# II

## STUDENT DESEGREGATION

A. *General Policies for Implementing Citywide Desegregation*

12. A major goal of the provisions of this Consent Decree shall be to eliminate racial/ethnic segregation or identifiability in any S.F.U.S.D. school, program, or classroom and to achieve the broadest practicable distribution throughout the system of students from the racial and ethnic groups which comprise the student enrollment of the S.F.U.S.D. For purposes of defining the racial/ethnic composition of the system and of each school, nine racial/ethnic groups are identified: Spanish-surname, Other White, Black, Chinese, Japanese, Korean, Filipino, American Indian, and Other Non-White.

13. To achieve the above-stated goal, the following guidelines shall apply:

a. No school shall have fewer than four racial/ethnic groups represented in its student body.

b. No racial/ethnic group shall constitute more than 45% of the student enrollment at any regular school, nor more than 40% at the following alternative schools:

Wallenberg High School
Lawton Middle School
International Studies
Second Community
San Francisco Community
Clarendon
New Traditions
Douglas Traditional
Argonne Elementary
Rooftop
Lilienthal
Lakeshore
Buena Vista
John Swett

In the event the percentage of any racial/ethnic group at any of the above-mentioned alternative schools exceeds 40% af-

ter September 1983, the S.F.U.S.D. shall apply the provisions of subparagraph (c) to the entering class at such school.

c. Beginning with the 1983–84 school year, the S.F.U.S.D. shall monitor the entering classes of all regular schools in which a single racial/ethnic group comprises more than 45% of the student enrollment, to assure that students in that racial/ethnic group will not comprise more than 40% of the entering class at any such school.

d. Beginning with the 1983–84 school year, the trigger point for the granting of Optional Enrollment Requests (OER transfers) shall be lowered from 43% to 40% at both sending and receiving schools.

e. The S.F.U.S.D., while retaining discretion to initiate, modify or terminate such special programs as magnet or alternative schools or curricula, shall, in exercising its discretion, continue to avoid choosing sites for such special programs which would disproportionately burden any racial/ethnic groups.

f. The S.F.U.S.D. shall continue to avoid facility utilization policies or practices, including school openings, closings, conversions, renovations, grade structure changes, boundary changes, or feeder pattern changes, that disproportionately burden any racial/ethnic group. The S.F.U.S.D. shall also continue to avoid transportation policies that disproportionately burden any racial/ethnic group.

g. Except upon agreement of the parties or order of the Court, the S.F.U.S.D. shall not be precluded from continuing to use optional attendance or discontiguous assignment zones where they contribute to desegregation.

B. *Special Provisions for Certain Designated Schools*

14. With respect to each school and racial/ethnic group listed below, as of September 1983, the maximum percentage of the listed racial/ethnic group shall be reduced to the percentage specified below:

| | |
|---|---|
| Alamo Park (Black) | 44.9 |
| Bret Harte (Black) | 43.0 |
| Bryant (Spanish Surname) | 42.5 |
| Downtown (Spanish Surname) | 40.0 |
| Edison (Spanish Surname) | 42.7 |
| Garfield (Chinese) | 41.2 |
| George Moscone (Spanish Surname) | 37.0 |
| Hawthorne (Spanish Surname) | 40.0 |
| Horace Mann (Spanish Surname) | 42.8 |
| Jean Parker (Chinese) | 42.7 |
| John Muir (Black) | 43.5 |
| John O'Connell (Spanish Surname) | 44.5 |
| Junipero Serra (Spanish Surname) | 40.8 |
| Leonard Flynn (Spanish Surname) | 43.2 |
| Marina (Chinese) | 43.6 |
| Spring Valley (Chinese) | 41.7 |
| Sutro (Chinese) | 39.4 |
| William Cobb (Black) | 43.4 |
| William de Avila (Black) | 41.0 |

15. The S.F.U.S.D. shall prepare and submit to the Court no later than April 1984 and annually thereafter during the term of this Decree reports on the extent to which special desegregation provisions are needed for other particular schools, or modifications are needed in any of the special provisions contained in this section. The parties shall endeavor in good faith to reach agreement on any such modifications proposed by the S.F.U.S.D., and may seek appropriate action from the Court.

16. On or before June 30, 1983, the parties will submit a joint report to the Court setting forth the extent to which additional educational resources or programs will facilitate implementation of the goals of this Consent Decree at any particular school(s).

C. *Special Plan for Bayview-Hunters Point Schools*

17. In order to desegregate the three elementary schools and the middle school in the Bayview-Hunters Point area, the S.F.U.S.D. shall adopt, with the approval of the Court, a plan which will, beginning in September 1983, with completion by the end of the 1985–86 school year:

a. consistent with paragraph 20 of this Decree, convert the Dr. Charles R. Drew School to an academic middle school with increased counseling to help prepare its graduates for the Lowell High School program;

b. consistent with paragraphs 21–24 of this Decree and Appendix A, reconstitute

the Sir Francis Drake School, to which students will be assigned, as a regular K-5 school with an enriched program emphasizing computer science;

c. consistent with paragraphs 25-27 of this Decree and Appendix B, establish the Dr. George Washington Carver School, to which students will be assigned, as a laboratory school with strong academic emphasis and with a local university as a partner to assist in developing the program; and

d. consistent with paragraph 28 of this Decree, convert the Pelton Middle School into an academic high school with a curriculum and program modeled after Raoul Wallenberg High School.

Students who reside in the Bayview-Hunters Point area shall have the option to attend other district schools with transportation provided by the S.F.U.S.D.

18. The S.F.U.S.D. shall declare all staff and administrative positions in the Bayview-Hunters Point Schools open, and shall reconstitute the staff and administration of those schools on the basis of a desegregation plan developed by S.F.U.S.D. and submitted to the Court. The plan shall specify changes in attendance boundaries and methods for selecting staff and administrators appropriate to the new educational programs. The plan shall provide for the assignment of administrators who are strong instructional leaders, with sufficient administrative support.

19. The plan to desegregate schools in the Bayview-Hunters Point area shall focus on improving both the educational quality of the schools and the public perception of the area.

### a. *Dr. Charles R. Drew School*

20. Dr. Charles R. Drew School shall be converted into an academic middle school with an academic program with high quality standards. It shall be renamed Dr. Charles R. Drew Academic Middle School. The newcomer middle school program shall be located at this site if feasible. The Drew staff shall be reconstituted to implement the new program and the S.F.U.S.D. shall provide special assistance in curriculum development, involving one of the area universities if necessary. A joint staff committee shall be established between the Drew School and Lowell High School for course development and implementation of courses that would lead to high secondary-level academic performance. Increased and appropriate counseling staff shall be provided to help prepare Drew students for the Lowell High School program. Transportation shall be provided for students coming from outside the attendance areas.

### b. *Sir Francis Drake School*

21. Sir Francis Drake Elementary School shall be converted from a basic K-5 elementary school to a computer-assisted instruction and computer science and awareness elementary school. This program shall be developed and implemented in cooperation with a local university. The principal assigned to Sir Francis Drake shall if possible have a joint appointment at the university.

22. Students assigned to Sir Francis Drake shall be afforded the opportunity to explore the many uses of computers and computer language with specific emphasis on developing a total awareness of computers and their place in our society. Sir Francis Drake shall have an assigned student attendance area that will enhance its racial/ethnic balance and take advantage of the changing demographics of the community.

23. In order to provide the quality of computer instruction that will be necessary to promote this program, existing staff positions shall be declared open, job descriptions developed, and a new staff selected from those applicants that are qualified. In the event there are not sufficient qualified teachers within the S.F.U.S.D. that meet these requirements for staff, new hires will be solicited to fill any vacancies.

24. The staff shall participate in staff development programs, both in the District and at the local university, that will ensure the continued building of a foundation that is computer-oriented. Each teacher in the program shall be required to give instruction using the computer terminals provided

as well as assisting students to program computers and further develop their understanding.

c. *Dr. George Washington Carver School*

25. Beginning September, 1983, Dr. George Washington Carver Elementary School shall be converted into an academic school, with an assigned attendance area.

26. The program at Dr. George Washington Carver shall build upon an agreement with a university. A specific agreement shall be negotiated between the university selected and the S.F.U.S.D. for the strengthening of the academic program at Carver and for the principal to have a joint appointment with the university, if possible.

27. The S.F.U.S.D., in consultation with the State Defendants and Plaintiffs, shall develop a comprehensive plan for the new academic school and for its relationship with the university as part of the Bayview-Hunters Point plan submitted to the Court pursuant to paragraph 17, above. The educational plan for Dr. George Washington Carver shall extend to all elements of the school's program, organization, staffing, community and parent relationship, curricular and extra-curricular activities, and relationship with other parts of the public school system.

d. *San Francisco Academic High School*

28. Pelton Middle School shall be converted into an alternative Traditional Academic High School and shall be renamed San Francisco Academic High School. San Francisco Academic High School shall have a curriculum and program modeled after Raoul Wallenberg High School.

e. *Cost of Implementation*

29. In order to provide the quality programs that are necessary to promote the desired integration of Dr. Charles R. Drew, Sir Francis Drake, Dr. George Washington Carver and San Francisco Academic High School, the S.F.U.S.D. shall review staffing patterns, class size, program, and buildings. Initial estimates suggest that a com- prehensive program of the type herein described for Bayview-Hunters Point may cost between $1 million and $1.5 million in the first year.

f. *Special Provisions for Staffing Drew, Drake, Carver, and San Francisco Academic High School*

30. The S.F.U.S.D. is authorized by this Consent Decree to select personnel for these four schools, whether from among existing certificated staff or from new hiring of certified and non-certified staff. This flexibility in staffing is essential to successful desegregation of these schools, in light of their substantial reorganization and difficult new missions.

g. *Public Information*

31. A coordinated public information effort aimed at dealing with public stereotypes about the Bayview-Hunters Point area shall be undertaken by the S.F.U.S.D. in consultation with State Defendants. This effort shall, *inter alia*, consist of the following:

(a) Publishing a program description of the Dr. George Washington Carver, Dr. Charles R. Drew, Sir Francis Drake and San Francisco Academic High School, which shall be mailed to the parents of all school-aged children in the city;

(b) Engaging a reputable public relations firm that will collaborate with the principals of the above-named schools to develop and implement a comprehensive public information campaign, the purpose of which shall be to highlight the changing demographics of the area; to promote new private housing development in the area; and to attract new parents and students to the schools by emphasizing the positive changes underway both in terms of quality programming and staffing; and

(c) Working closely with parents and families of the children of San Francisco in actively and positively promoting the educational programs in Hunters Point.

D. *State Government Warning on Transfers to Suburban School Districts*

32. Within 90 days of approval of this Consent Decree, the State Department of

Education shall formally notify suburban school districts that acceptance of students who reside in the S.F.U.S.D., and whose transfer adversely affects desegregation in the school they would otherwise be attending, will disqualify the suburban school district from state aid for such students and may make it liable to school desegregation proceedings. The State Department of Education shall require suburban school districts to give special attention to ending such existing transfers.

### E. *Military Transportation to Private Schools*

33. Transportation by the Defense Department of children who reside on military bases to private schools will undermine the ability of the S.F.U.S.D. effectively to carry out the provisions and purpose of the Consent Decree. In light of this fact, the parties shall submit a joint request to the appropriate military authorities for the termination of Defense Department transportation of children from military bases to private schools, and may seek appropriate assistance from the Court.

### III

### DESEGREGATION OF FACULTY, ADMINISTRATORS, AND OTHER STAFF

34. The S.F.U.S.D. shall continue to implement a staffing policy such as that contained in Policy No. 4111.1, the goal of which is "to achieve a staff at each school site and District location that will reflect the student population of the District."

35. The S.F.U.S.D. shall assure that faculty and other staff will be equitably assigned throughout the District, within the meaning of applicable legal standards.

### IV

### STAFF DEVELOPMENT

36. The S.F.U.S.D., after consultation with the State Defendants, shall develop and submit to the Court and parties no later than April 1, 1983, a comprehensive staff development plan and budget necessary to implement the provisions of this Decree. The plan and budget shall include up to six days per year of staff development, some of which may be outside the regular school calendar, and shall cost no more than $800,000 per year. The training shall address areas identified as essential for staff in school districts undergoing desegregation, such as the following: student discipline procedures and goals; academic achievement and performance goals; teaching in a diverse racial/ethnic environment; parental involvement; and the desegregation goals and provisions of this Consent Decree.

### V

### EXTRA–CURRICULAR ACTIVITIES

37. The parties agree that it is important to ensure that the extra-curricular activities of the S.F.U.S.D. are available to all students on a basis which is consistent with the obligation to avoid segregation and provide equal educational opportunity. Accordingly, the S.F.U.S.D., after consultation with the State Defendants, shall submit to the parties and the Court by May 1, 1983, a program for monitoring extra-curricular activities to find out the extent to which students from the various groups do or do not participate in various activities and to develop methods for informing them fully about their opportunities to participate.

### VI

### SCHOOL DISCIPLINE

38. The parties agree that it is important in a multi-cultural, multi-racial, multi-ethnic school population undergoing desegregation that discipline be, and be perceived to be, fair and consistent for students from all groups. Accordingly, within 90 days of the Court's approval of this Consent Decree, any party may submit a report to the Court setting forth its views on an appropriate Student Code of Conduct.

## VII

### ACADEMIC EXCELLENCE

39. The parties agree that the overall goal of this Consent Decree will require continued and accelerated efforts to achieve academic excellence throughout the S.F.U.S.D. The S.F.U.S.D. shall evaluate student academic progress for the purpose of determining the curricula and programs most responsible for any improved test scores and learning in the District and the extent to which these curricula and programs are available to students of all racial/ethnic groups. The S.F.U.S.D. shall adopt any additional curricula and programs necessary to promote equal educational opportunity.

40. The annual report required in paragraph 44 of this Consent Decree shall include a section on S.F.U.S.D.'s progress toward the goal of academic excellence, setting forth test scores and other evaluative data for each building and for the District as a whole.

41. The S.F.U.S.D. shall continue to assure the availability of academic courses on a basis that is not racially or ethnically discriminatory.

## VIII

### PARENT AND STUDENT PARTICIPATION

42. The parties acknowledge the value in the schools of parent, student, staff, and community representation which reflects the racial/ethnic diversity of a school district which is undergoing desegregation. The S.F.U.S.D. shall continue its effort to encourage and improve participation of parents, students, staff, and community. Any party may submit to the Court by May 1, 1983, its recommendations for any additional steps necessary to assure adequate representation of parents, students, staff, and the community in the implementation of the desegregation goals contained in this Consent Decree.

## IX

### HOUSING AND DESEGREGATION

43. Because of the critical impact of government housing policies on school segregation, the parties shall engage in the following program, individually and jointly, to try to secure policies and actions by federal, state and local housing agencies that promote rather than impede school desegregation and integration.

a. Within one month of the entry of this Consent Decree the parties shall submit joint letters to the relevant local, state, and federal agencies requesting information on the location and tenancy of existing subsidized housing in the San Francisco housing market area and asking that the agencies devise policies that will support rather than undermine school desegregation and integration. The letters will request that the concerned agencies meet with the parties to review the impact of existing policies and join in a planning process to devise policies and procedures to avoid segregation in subsidized housing, help integrate existing segregated neighborhoods, and help stabilize existing integrated communities.

b. The parties shall select an expert who shall be retained for the purpose of reviewing the information obtained from the relevant agencies and prepare an analysis of the extent to which local, state or federal housing policy will undermine or interfere with the implementation of the provisions of this Consent Decree, as well as specific recommendations for changes in the policies and practices of the relevant agencies. Copies of the expert's analysis and recommendations shall be provided to the parties for their comments and alternative recommendations, if any. The parties shall seek to agree on a joint analysis and recommendations.

c. The joint analysis and recommendations of the parties shall be submitted to the Mayor of San Francisco, the San Francisco Public Housing Authority, the San Francisco Redevelopment Agency, and concerned state and federal agencies. The

responses of the agencies will be evaluated by the parties to determine their adequacy and the need for further action. The joint analysis and recommendations, the responses of the relevant agencies and the parties' plans in light of those responses shall be included in the reports to the Court required by subparagraph d below.

d. No later than one year after the entry of this Consent Decree and annually thereafter, the designated expert shall submit to the Court and the parties a report on progress in promoting and achieving policies and actions by housing agencies that promote school desegregation and integration. In addition, each party shall notify the Court and the other parties of housing developments or changes in housing policy that would intensify the problem of school segregation in any part of the District.

e. In evaluating the ' response of the housing agencies and preparing recommendations, the parties shall consider the following issues, among others: the impact of locating additional housing in areas of the city already racially segregated; the need for the development of tenant selection policies for subsidized family housing projects that will promote integration; the need to stabilize areas that are residentially integrated; the development of policies to maintain residential and school integration in areas undergoing "gentrification"; special counseling efforts to show families with Section 8 certificates housing outside racially isolated areas; automatic termination of involuntary transportation programs when neighborhoods become residentially integrated; and development and improvement of fair housing monitoring and training programs.

## X

### REPORTING AND MONITORING

44. The S.F.U.S.D. shall report to the Court no later than August 1, 1983, and annually thereafter for the duration of this Decree on the performance of the S.F.U.S.D.'s responsibilities under this Consent Decree. The Annual Report shall include sec-

tions relating to each portion of this Consent Decree, and shall include the identification of any school the S.F.U.S.D. intends to take out of service or otherwise convert from present usage for the coming year. The District shall contract with the State Department of Education to make an independent review of implementation of this Consent Decree at the close of each school year and to submit a report to the Court no later than August 1 for the preceding school year. The parties, by their counsel, shall meet quarterly for the first year, and periodically thereafter, to review implementation of the Consent Decree and to determine whether any additional monitoring techniques should be proposed to the Court.

## XI

### THE STATE ROLE IN FINANCING THE PLAN

45. The parties agree and the Court finds that the costs of compliance with, and monitoring of, this Consent Decree constitute costs mandated by a final court order for which the S.F.U.S.D. is entitled to reimbursement under Sections 42243.6 and/or 42249 of the California Education Code.

46. Defendant California State Department of Education shall assist the S.F.U.S.D. in documenting its claims for reimbursement under Sections 42243.6 and/or 42249 with respect to the costs of compliance with this Consent Decree, and support such claims before the State Legislature, the State Controller and the State Board of Control.

47. In the event that the S.F.U.S.D. claims for reimbursement are challenged, the S.F.U.S.D. and State Defendant shall report to the Court identifying the difficulties in obtaining reimbursement. Any of the parties may propose to the Court action designed to protect the integrity and timely implementation of the provisions of this Consent Decree.

## XII

### RETENTION OF JURISDICTION

48. The Court retains jurisdiction of this action for the purpose of receiving the

Reports required to be submitted under provisions of this Decree and to enter such additional orders as may be appropriate. At any time after six years from the date of the entry of this Consent Decree, Defendants may move the Court, upon 30 days' notice to Plaintiffs, for dissolution of this Decree. In considering whether to dissolve the Decree, the Court will take into account whether Defendants have substantially complied with the Decree and whether the basic objectives of the Decree have been achieved.

49. The availability of funds will determine the scope and timing of implementation of the provisions of this Decree.

50. Any party to this Decree may at any time propose modification of the Decree to the Court and the other parties.

## XIII

### NOTICE AND OBJECTIONS

51. Within ten days of the entry of this Consent Decree, the S.F.U.S.D. shall give notice of this Decree to the class represented by Plaintiffs. The form and content of the notice shall be as set forth in Appendix C to this Decree.

52. The Notice shall be published three times weekly for two consecutive weeks in both the *San Francisco Chronicle* and the *San Francisco Examiner.* It shall be published in a prominent position as a display advertisement, in a type size no smaller than that normally used for news stories in each publication, with a heading in larger, boldface type.

53. The S.F.U.S.D., after consultation with the parties, shall issue a press release on or before the date on which publication of the Notice commences. The press release shall announce the Consent Decree, state that copies thereof will be available at the Court and at the headquarters offices of S.F.U.S.D., and explain the opportunity for interested persons to object in writing and appear at the hearing before this Court on February 14, 1983. The S.F.U.S.D. shall maintain copies of the Notice and of the Consent Decree at its headquarters offices

to furnish to persons requesting information concerning the Decree, and shall make such copies available at any press conference concerning the Decree in which District representatives participate.

54. The Notice shall afford members of the class and other affected persons or organizations an opportunity to file written objections to this Decree with the Clerk of the Court within thirty days following the date of the initial publication of the Notice. The Clerk will promptly transmit copies of these objections to counsel of record.

55. The Court will hear oral argument on any timely-filed objections to this Decree at 9:30 a.m. on February 14, 1983.

### *Appendix A*
### SIR FRANCIS DRAKE

Sir Francis Drake School will continue to be a regular K–5 school with a defined attendance area, and assignment of pupils.

Beginning in September 1983, the following desegregative techniques will be employed to bring Drake into compliance with S.F.U.S.D. desegregation policy and the provisions of this Consent Decree.

*Admission Process will be based on the following:*

1. Assigned attendance area. (Buses will be provided if necessary).

2. Maintenance of district guidelines relevant to the area of racial integration.

*Course of Study*

1. Consistent with district guidelines, a computer (High Tech) curriculum will be designed, which will maintain a regular K–5 basis elementary instruction program but will emphasize the use of computers to problem solve and review skills.

*Program*

1. Computer technology and application.

2. In addition Bilingual education will become an essential component of the program.

*School Staffing*

1. All positions will be declared open.

2. Staff will be reassigned as needed to comply with applicable S.F.U.S.D. guidelines and the provisions of this Consent Decree.

3. When existing district staff have not demonstrated the unique qualities essential for specific positions, non-district staff may be recruited.

### Appendix B
### DR. GEORGE WASHINGTON CARVER

*Admission Process will be based on the following:*

1. Assigned attendance area (September, 1983); and

2. Maintenance of district guidelines four ethnics group represented.

*Course of Study*

1. In keeping with S.F.U.S.D. guidelines, a curriculum will be implemented that is an academic K–5 instructional program. This program will be developed by the staff in conjunction with the selected university.

*Program*

1. The program at Dr. George Washington Carver will maintain an academic laboratory school model in conjunction with a selected university.

2. The educational plan for Dr. George Washington Carver Elementary School will extend to all elements of the school's program, organization, staffing, community and parent relationship, curricular and extra-curricular activities, and relationship with other parts of the public school system, and may include the use of computers.

*The program should be responsible for the following:*

1. Avoiding numerous, short term consultancies of university staff to assist the new school and seeking arrangements under which university faculty have continuing relationships.

2. Develop a strong university staff presence *at the school* so that university faculty become personally known to teachers, students and parents.

3. Consider the appointment of selected teachers at the school to part time or adjunct roles on the university faculty so that the university can gain from its close collaboration with the school, so that status relationships are improved.

4. Assume that all departments and professional schools of the University are available for special tasks.

5. Drawing on the university for a comprehensive program of staff development at the new school with the district staff development department.

*School Staff*

1. All staff assignments will be declared open.

2. Staff will be reassigned as needed to comply with applicable S.F.U.S.D. guidelines and the provisions of this Consent Decree.

3. When existing district staff have not demonstrated the unique qualities essential for specific positions, non-district staff may be recruited.

### Appendix C
### NOTICE OF THE PROPOSED SETTLEMENT OF THE SAN FRANCISCO UNIFIED SCHOOL DISTRICT DESEGREGATION CASE AND OF THE HEARING ON THAT SETTLEMENT

To: All Students Presently Enrolled Or Who Will Enroll in the San Francisco Public School System, Their Parents, and Their Guardians:

A lawsuit challenging certain practices of the San Francisco Unified School District and seeking court action to desegregate more fully the schools and provide equal access to programs and facilities of the School District has been pending in the United States District Court for the Northern District of California since 1978. Plaintiffs, who represent the class of all present and future students of the School District, have reached an agreement with Defendants (the San Francisco Unified School District, the State Department of Education, and officers or members of their governing boards) to settle the case based on the

terms of a Consent Decree entered December 30, 1982. The Consent Decree is summarized below, and copies are available from the Clerk of the Court and from the School District, as described more fully below. You are encouraged to examine the summary of the Decree, as its provisions, many of which would go into effect as the beginning of the 1983–1984 school year, may affect you directly.

On December 30, 1982, the Court gave preliminary approval to the Consent Decree, but it will not become final until class members have been notified of the settlement by this Notice and the Court has heard any objections to the fairness and adequacy of the Consent Decree.

### Hearing and Objections

The Court will consider objections to the Decree at a hearing on February 14, 1983 at 9:30 a.m., in Courtroom 11 of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California. At the hearing, you or your counsel may appear in person to make an oral presentation explaining why the proposed Consent Decree should or should not be allowed to go into effect.

If you or your counsel wish to make an oral presentation at the hearing, you must file a written statement with the Clerk of the Court, United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102 on or before January 28, 1983. You may file at the Clerk's office in person or by mail, but the statement must arrive at the Clerk's office no later than 5:00 p.m., January 28, 1983. The statement must describe the position you will advocate before the Court, and copies of any documents to which you intend to refer must be attached. You must provide four copies of your statement and attachments so that the Clerk immediately may forward copies to counsel of record. The first page of the statement must include the name of the case, *San Francisco NAACP v. San Francisco Unified School District*, and its docket number, C–78–1445–WHO.

If you do not wish to make an oral presentation at the hearing, you or your counsel instead may file a written brief with the Clerk of the Court on or before January 28, 1983. The brief should explain why the Consent Decree is or is not a fair, reasonable, and adequate settlement of the action, and copies of any documents discussed in the brief (other than the Consent Decree itself) should be attached. Again, four copies of the brief and attachments must be filed with the Clerk of the Court, and the first page must be marked with the name of the case and its docket number.

*Do not write or call Judge Orrick directly.* If you are satisfied with the settlement set out in the Consent Decree, you need not take any action. If you are not satisfied with it, you should follow the procedures described above.

### Examination of the Consent Decree and Pleadings

Copies of the Consent Decree will be available between 9:00 a.m. and 5:00 p.m., Monday through Friday in the Office of the Clerk of the Court at the United States Courthouse, 450 Golden Gate Avenue, San Francisco, and at the headquarters offices of the San Francisco Unified School District, 135 Van Ness Avenue, San Francisco, California 94102. You also may inspect any of the pleadings and papers filed with the Court in this action at the office of the Clerk of the Court.

### History of the Action

In June 1978 Plaintiffs, the San Francisco chapter of the National Association for the Advancement of Colored People (NAACP) and the parents of several black students enrolled in the District, filed suit against the local and state school officials. The Complaint charged that the School District unlawfully concentrated students and faculty in certain schools by race or ethnic group, that the faculty and administrators did not include as large a proportion of minorities as did the student body, and that the various racial or ethnic groups received unequal treatment and had unequal access

to both academic and extra-curricular programs provided by the School District.

On June 30, 1981, the Court made findings of fact concerning some of the allegations of racial or ethnic imbalances in the School District in an Order denying Plaintiffs' motion for partial summary judgment. The Court subsequently appointed a Settlement Team, the members of which included educational specialists, to prepare a report that became the basis for settlement negotiations. The Consent Decree represents the parties' agreement resulting from these negotiations.

### Summary of the Terms of the Consent Decree

The parties agree that while progress has been made in desegregating the San Francisco schools, the Court would be justified in making factual and legal conclusions sufficient to require the systemwide remedies that are set forth in the Consent Decree.

### A. Student Desegregation

For purposes of the Consent Decree, nine racial or ethnic groups in the District are identified: Spanish-surname, Other White, Black, Chinese, Japanese, Korean, Filipino, American Indian, and Other Non-white. A major goal of the student desegregation plan would be to eliminate racial/ethnic segregation or identifiability in any school, program, or classroom and to achieve the broadest practicable distribution throughout the system of students from the racial and ethnic groups which comprise the student enrollment of the District. Regular schools would have students from no fewer than four of the nine racial/ethnic groups, and students from any one group would represent 45% or less of the student enrollment at any school. The percentage of any one racial/ethnic group at specified alternative schools would be 40% or less.

These goals would be achieved, beginning in the fall of 1983, by assignment, reassignment, and transfer of students, and by adjusting the composition of the entering classes for each non-complying school so that no more than 40% of any entering class would be made up of students from any one racial/ethnic group. The District would revise attendance zones and provide transportation as needed to accomplish these desegregation goals. Optional attendance zones and attendance zones drawing students from separated areas would be used only as a means of achieving desegregation. The School District would be free, however, to use magnet or alternative schools or programs to help meet the goals of the consent decree.

The schools in the Bayview-Hunters Point area would be converted into magnet or special schools with enriched programs. *Dr. Charles Drew School* would become an academic middle school with increased counseling to help prepare its graduates for the Lowell High School program. The programs at *Dr. George Washington Carver School* would be academically enhanced and students would be assigned to that school. The programs at *Sir Francis Drake School* would be enriched and an emphasis placed on computer science; a new attendance area also would be established. *Pelton Middle School* would become the new San Francisco Academic High School, with a curriculum and program modeled after Raoul Wallenberg High School.

### B. Desegregation of Faculty, Administrators, and Other Staff

At the earliest practicable date, the Consent Decree would require the District to implement its policy to assure that the racial/ethnic composition of the full-time faculty, administrators and other staff of the District reflects that of the District's student enrollment. The District would also be required to assure the equitable distribution of staff throughout the District.

### C. Staff Development

Under the Consent Decree the District would develop a comprehensive plan and budget to address areas identified as essential for training staff in school districts underdoing desegregation.

### D. *Extra-Curricular Activities*

Under the Consent Decree the District would develop a program to monitor equal access to extra-curricular activities.

### E. *School Discipline*

The parties would be authorized to prepare a report to the Court on an appropriate Student Code of Conduct to assure fairness and consistency in school discipline.

### F. *Monitoring Student Achievement*

The Consent Decree would require the District to monitor student test scores and academic results in order to evaluate the continued effort to achieve academic excellence throughout the system.

### G. *Parent and Student Participation*

Under the Consent Decree, the District would continue its efforts to enhance the role of students, parents, staff and community representatives in the schools. The parties would be authorized to submit further recommendations to the Court on additional steps to assure adequate representation of parents, students, staff and the community.

### H. *Housing*

The Consent Decree would commit the parties to a joint effort to persuade federal, state and local housing agencies to develop and implement policies that will promote rather than impede school desegregation.

### I. *Reporting and Monitoring*

Under the Consent Decree, the District Superintendent would report to the Court periodically for at least six years on compliance with the terms of the Decree and progress toward reaching its goals. The State Department of Education also independently would review the District's compliance and report to the Court annually on implementation of the Consent Decree.

### J. *State Financing*

The relief ordered by the Consent Decree would entail additional costs for the District which qualify for reimbursement from the State as costs of complying with a court order. The State defendants would assist the District to obtain such reimbursement.

### K. *Jurisdiction Retained*

The Court would retain jurisdiction under the Consent Decree to enforce its provisions, receive progress reports, and enter such additional orders as may be appropriate. After six years, the Defendants could move to terminate the Decree, which the Court will consider doing if the District substantially has complied with the Decree and the Decree's basic objectives have been achieved.

### EXHIBIT B

The members of the Settlement Team were as follows:

#### *Court Appointees*

*Harold Howe II.* Professor Howe is currently a Senior Lecturer at the Harvard University Graduate School of Education. He formerly served under President Lyndon Johnson as the United States Commissioner of Education (1965–68), and for the Ford Foundation as Program Advisor in Education, New Delhi, India; Vice President for Education and Research; and Vice President for Education and Public Policy. He has also served on numerous national and international committees dedicated to educational policy formulation and research, including the Committee on Examinations of the College Entrance Examination Board, the United States Council for UNESCO, and the National Council of Education (Chairman 1980–81) of the National Institute of Education. Professor Howe is currently Chairman of the Board of Directors of the Institute for Educational Leadership, a trustee of Teachers College, Columbia University, and a participant in the Hispanic Policy Development Project. He is the author of numerous articles pub-

lished in educational periodicals and books. Professor Howe's speeches delivered during his tenure as Commissioner of Education have been collected in a book entitled *Picking Up the Options* (1968).

*Gary A. Orfield.* Professor Orfield currently is a Professor of political science, public policy, and education at the University of Chicago. He completed his training as a scholar-in-residence with the United States Civil Rights Commission and as a research associate at the Brookings Institute in Washington, D.C. He has served as Chairman of a study group on desegregation research for the National Institute of Education, and as an educational consultant to the Ford Foundation, and to the Departments of Housing and Urban Development, Education, and Justice. Professor Orfield previously assumed the role of court-appointed expert in the St. Louis and Los Angeles school desegregation cases. He has written numerous articles on school desegregation published in various periodicals and he has authored four books on the subject: *Reconstruction of Southern Education: The Schools and the 1964 Civil Rights Act* (1969); *Congressional Power: Congress and Social Change* (1975); *Must We Bus? Segregated Schools and National Policy* (1978); *Toward A Strategy of Urban Integration* (1982).

### Plaintiffs' Appointees

*Gordon Foster.* Professor Foster currently is a professor of education at the University of Miami (Florida). Since 1966, he has served intermittently as the Director of three Miami Desegregation Assistance Centers, for race, for national origin (bilingual education), and for sex, and also as Associate Director of the Florida School Desegregation Consulting Center. Additionally, he has acted as a paid consultant to the state Boards of Education of Delaware, Illinois, Iowa, Michigan, Missouri, and Pennsylvania, and to the local school boards of twenty-two cities, including Los Angeles. Dr. Foster is the author or co-author of numerous articles on school desegregation contained in various publications, including a report for the United States Commission on Civil Rights concerning the Detroit desegregation case and interdistrict remedies. He is the editor or author of, or contributor to, over thirty school studies and forty desegregation plan studies for districts in twenty-seven states. Dr. Foster is no stranger to the courts. He has testified as an expert witness in twenty-nine federal court, and five state court, school desegregation cases. In addition to this case, he has served as the court-appointed expert for Judge Merhige in the Petersburg (Virginia) case, for Judge Roth in the metropolitan Detroit case, and for Judge Battisti in the Cleveland case.

*Robert L. Green.* Professor Green is currently the Dean of Urban Affairs Programs at Michigan State University. He has at times been the Dean of the College of Urban Development, a professor of educational psychology, Assistant Provost, and Director of the Center for Urban Affairs at Michigan State. He has also lectured for a year at Hebrew University in Jerusalem, Israel, and at the University of Nairobi, Kenya. Professor Green has served as a consultant to the Detroit, Lansing (Michigan), Hartford (Connecticut), and Dade County (Florida) school districts and to the State of Illinois in their selection of school superintendents. Also no stranger to the courts, Dr. Green has testified as an expert witness and/or consultant in sixteen school desegregation cases, and has prepared reports on the implementation of desegregation plans in three of those cases. Additionally, he acted as lead consultant to the Chicago Public School system in its desegregation efforts. Dr. Green has served as Director and principal investigator of two studies conducted for the United States Office of Education. He has authored, edited, or contributed to literally hundreds of articles, books, papers, and texts in the fields of education (particularly school desegregation), history, literature, literary criticism, psychology, psychometrics (educational testing), public policy, and sociology, with a special emphasis on the experience of Blacks and other minorities.

### District's Appointees

*Barbara Cohen.* Ms. Cohen is currently the Administrative Assistant to the Superintendent of the San Francisco Board of Education. Formerly, she served as a Program Associate to the San Francisco Mental Health Association, and as a Education/Integration Specialist and a Community Field Representative for the San Francisco Board of Education. Ms. Cohen has consulted with Far West Laboratories and a number of school districts concerning school desegregation, and with the National Education Strategy Center concerning educational policy.

*Fred C. Leonard, Jr.* Mr. Leonard is currently Associate Superintendent for Instructional Support Services of the San Francisco Unified School District. Formerly, he was the Assistant Superintendent for Personnel Services of the San Francisco Unified School District and of the Cupertino Unified School District. Mr. Leonard brought to the team considerable experience in curriculum design and in dispute resolution. He presently participates in the California State University's (San Francisco) Urban Mission Bridging Project and has served on the University of San Francisco's Curriculum Review Committee, on the Cupertino Unified School District's teacher contract negotiating team and Affirmative Action Committee, on the Ann Arbor (Michigan) Principals Association's teacher contract negotiating team, and on the Ann Arbor school district's Staff Grievance Committee. Additionally, Mr. Leonard has acted as a consultant in a study conducted at the University of Michigan concerning the principal's role in the desegregation process.

### State's Appointees

*Ples A. Griffin.* Dr. Griffin is currently Chief of the Office of Intergroup Relations for the California Department of Education. He formerly was a staff consultant to the State Department of Education, specializing in employment practices for certified personnel and the ethnic distribution of pupils, and a teacher/counselor in the Pasadena Unified School District and at Pasadena City College. He served as Executive Secretary on a statewide commission on Equal Educational Opportunity in 1969 and 1970. Additionally, Dr. Griffin has acted as a special consultant to the Rand Corporation on a study of the cognitive affects of desegregation on public school children; to the National Science Foundation on a study conducted at Florida Atlantic University of the relationship among school desegregation, "white flight," and resegregation; to the Nevada Department of Education in a staff workshop on equal educational and employment opportunities and school desegregation; and to the United States Office of Education on a project to develop programs specifically addressing the needs of black children in the nation's public schools.

*Thomas M. Griffin.* Dr. Griffin is currently a lecturer in a graduate student law course at the University of California at Berkeley. Formerly, he was Chief Counsel and Administrative Advisor at the California Department of Education, and Chief of the Legal Section of the California Department of Human Resources. Dr. Griffin is a founding member of the Association of California State Attorneys, a member of the National Association of state Boards of Education and Chairman of its Legal Affairs Committee, and a member of the California Bar Association's Committee on the Maintenance of Professional Competence. Additionally, Dr. Griffin serves on the state Assembly's Advisory Committee on the Implementation of the Permissive Education Code (Subcommittee Chairman). He is the author of a number of articles on law and school administration.