**Brian HO, by his parent and next friend, Carl HO, et al., Plaintiffs,**

**v.**

**SAN FRANCISCO UNIFIED SCHOOL DISTRICT, et al., Defendants.**

**No. C–94–2418 WHO.**

United States District Court, N.D. California.

May 5, 1997.

**1318**

Daniel C. Girard, Girard & Greene, LLP, San Francisco, CA, for Plaintiffs.

Aubrey V. McCutcheon, Jr., Aubrey V. McCutcheon, Jr. Law Offices, Ypsilanti, MI, for San Francisco Unified School District and San Francisco Bd. of Education.

Thomas Barry A. Zolotar, California State Dept. of Educ., Sacramento, CA, for Waldemar Rojas, Bd. of Education of the State of California, California Dept. of Education, and William D. Dawson.

James L. Hunt, McCutcheon, Doyle, Brown & Enersen, San Francisco, CA, Peter Graham Cohen, Petaluma, CA, Eva Paterson, Lawyers' Committee for Urban Affairs, San Francisco, CA, Thomas I. Atkins, Brooklyn, NY, for San Francisco Nat. Ass'n for the Advancement of Colored People.

## OPINION

ORRICK, District Judge.

The Consent Decree entered on April 30, 1983, in *San Francisco NAACP v. San Francisco Unified School District*, No. C–78–1445 WHO, to end segregation in the San Francisco Unified School District ("SFUSD") provides, in paragraph 13, that of the nine racial or ethnic groups of which the student population was composed in 1983,[1] no fewer than four are to be represented in any school's student body, with no racial/ethnic group permitted to constitute more than 45 percent (40 percent at any "alternative school") of the school's total enrollment.

Named plaintiffs Brian Ho, Patrick Wong, and Hilary Chen, each of whom applied to and was rejected for admission to schools "capped out" (at the maximum level of enrollment) for students of their race/ethnicity, bring this class action under 42 U.S.C. § 1983 to dissolve the Consent Decree, which they allege was and is unconstitutional, and to restore the status quo. The case is currently before the Court on plaintiffs' motion for summary judgment. For the reasons hereinafter set forth, the Court denies plaintiffs' motion.

## I.

Plaintiff Brian Ho was five years old in 1994. He was rejected from the 1994–95 entering kindergarten class of Lawton and Jefferson elementary schools, one of which was his neighborhood school, because these

---

1. The nine are Spanish-surname, Other White, African–American, Chinese, Japanese, Korean, Filipino, American Indian, and Other Non–White.

schools were "capped out" for students of Chinese descent. Plaintiff Patrick Wong, who was fourteen years old in 1994, was not admitted to Lowell High School because his entry index score of 58 was lower than the minimum score of 62 required for Chinese applicants, although it was equal to the minimum score of 58 required for applicants of other racial/ethnic groups.[2] Wong also was rejected for admission to two other high schools because those schools were "capped out" for students of Chinese descent. Plaintiff Hilary Chen was eight years old in December 1993. She was rejected for transfer admission to Lawton, Stevenson, and Jefferson elementary schools because each school was "capped out" for students of Chinese descent.

The named plaintiffs represent a class consisting of "all children of Chinese descent of school age who are current residents of San Francisco and who are eligible to attend the public schools of the SFUSD." (Mem. Decision and Order filed Mar. 8, 1996, at 3.) The Court granted plaintiffs' motion for class certification by Memorandum Decision and Order filed March 8, 1996. Plaintiffs allege that the Consent Decree, entered into between the San Francisco National Association of Colored People ("SFNAACP") and defendants SFUSD, its board members, and its Superintendent (collectively "Local Defendants") and the California State Board of Education, its members, the State Superintendent of Public Instruction, and the State Department of Education (collectively "State Defendants"), violates their rights to equal protection under the Fourteenth Amendment because of an invalid classification and assignment of students to schools by race. The SFNAACP was joined as a defendant in this action pursuant to an Order issued by the Court on January 19, 1995.

## II.

### A.

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has made this showing, the nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

### B.

To state a cause of action under § 1983, the plaintiff must show that (1) a person acting under color of state law (2) committed an act that deprived the plaintiff of some

**2.** Lowell, an academic "alternative" high school that admits students based on a combination of grades and test scores, recently changed its admission policies to ameliorate the problem, a result of the constraints of paragraph 13 of the Consent Decree, of turning away Chinese–American applicants with higher scores than members of other ethnic groups. In response to this lawsuit, last year the school board "established a single cutoff score for all races, but set aside 20 percent of the freshman class for those with lower scores." G. Pascal Zachary, *Class Action: Need, as a Substitute for Race Preferences, Is Just as Hot an Issue, The Wall Street Journal*, Apr. 10, 1997, at A8. Criteria for selection in the set-aside group includes a mix of socioeconomic factors, but admission still requires achievement of a specified minimum test score. *Id.* "The new process resulted in about 55 disadvantaged white and Asian students winning admission to Lowell, virtually none of whom would have been admitted under the old formula." *Id.*

right, privilege or immunity protected by the Constitution or laws of the United States. *Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir.1988). Plaintiffs here allege that defendants, acting under color of state law, have invalidly classified and assigned students based on race, thereby depriving plaintiffs of their right to equal protection under the Fourteenth Amendment to the United States Constitution. Because the issue whether defendants have acted under color of state law is no longer in dispute, plaintiffs will prevail on their motion for summary judgment if they can demonstrate the absence of a dispute of material fact and that they are entitled to judgment as a matter of law on their Fourteenth Amendment claim.

### C.

#### 1.

■ Plaintiffs' first challenge to the Consent Decree is to its constitutionality when entered. In a Memorandum Decision and Order denying defendants' motion to dismiss, filed September 28, 1995, this Court acknowledged that

> the Court never actually determined that paragraph 13, a race-based remedy, was constitutional *under strict scrutiny review.* *(See* Consent Decree Order at 23:9 (no constitutional violations on the part of defendants were proved).) Rather, the Court evaluated the Consent Decree based on whether it was "fundamentally fair, adequate and reasonable." *Id.* at 17:21. The Court focused on how the Consent Decree addressed constitutional violations *alleged,* rather than constitutional violations *found.*

(Mem. Decision and Order at 10:23–11:2 (first emphasis added).) The Court's not having applied strict scrutiny to the Consent Decree in 1983 does not mean, however, that in assessing whether the Consent Decree was "fundamentally fair, adequate and reasonable" the Court did not also consider its constitutionality under then-existing Supreme Court precedent applicable to factually similar cases. *See United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981)

("Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence."); *United States v. Oregon,* 913 F.2d 576, 580–81 (9th Cir.1990), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2889, 115 L.Ed.2d 1054 (1991) ("because it is a form of judgment, a consent decree must conform to applicable laws") (citing *Miami,* 664 F.2d at 439); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1,* 921 F.2d 1371, 1383 (8th Cir.1990) ("A court has a strong interest in not involving itself, along with the prestige of the law, in an ongoing equitable decree which is either manifestly unworkable or plainly unconstitutional").

Nor does it appear that the Consent Decree was unconstitutional, under then-applicable standards, when entered. Similar consent decrees across the country successfully withstood constitutional scrutiny during approximately the same period. *See, e.g., United States v. Board of Educ. of Chicago,* 554 F.Supp. 912, 919 (N.D.Ill.1983) (plan similar to the Consent Decree, similarly unlitigated, was approved by the court as falling "within the broad range of constitutionality established by law"); *Geier v. Alexander,* 801 F.2d 799 (6th Cir.1986) (use of racial quotas to help eliminate residual effects of *de jure* segregation in Tennessee's higher education system did not violate equal protection guarantees).

■ Even if the Consent Decree had been unconstitutional when entered, however, plaintiffs, as a subclass of the original class of plaintiffs that entered into the Consent Decree, would be barred from raising the issue now.[3] As a judgment, a consent decree has the force of *res judicata.* *SEC v. Randolph,* 736 F.2d 525, 528 (9th Cir.1984). Although

---

3. The *SFNAACP* plaintiff class consisted of "all children of school age who are, or may in the future become, eligible to attend the public schools of the S.F.U.S.D. ...." *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 576 F.Supp. 34, 52 (N.D.Cal.1983).

in its Memorandum Decision and Order filed September 28, 1995, this Court found that plaintiffs' *entire suit* was not barred by the doctrine of *res judicata*, principally because of the extent to which plaintiffs' claims of unconstitutionality were based on the operation of the Consent Decree in the years *after* 1983, assessment of the *res judicata* effect of the Consent Decree on the issue of the Consent Decree's constitutionality when entered requires a different analysis.

■ *Res judicata*, or claim preclusion, prevents the relitigation of claims previously tried and decided. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Under applicable principles of federal law, in order for the *res judicata* bar to apply, an adjudication must "(1) involve the same 'claim' as the later suit, (2) have reached a final judgment on the merits, and (3) involve the same parties or their privies." *Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1404 (9th Cir. 1993) (citations omitted). A class action judgment "binds all class members on every matter which was or *could have been* offered to sustain or defeat the claims sued upon." W. Schwarzer, A. Tashima, and J. Wagstaffe, *California Practice Guide: Federal Civil Procedure Before* Trial § 10:598 (The Rutter Group 1996) (hereinafter "Schwarzer"). Plaintiffs cannot avoid *res judicata* merely by alleging conduct that was not alleged in the prior action, or by pleading a new theory. *McClain v. Apodaca*, 793 F.2d 1031, 1033 (9th Cir.1986).

■ The entry of a consent decree constitutes a final judgment on the merits for *res judicata* purposes. *See, e.g., Safe Flight Instrument Corp. v. United Control Corp.*, 576 F.2d 1340, 1344 (9th Cir.1978) (distinguishing between "the conclusive, res judicata effect properly accorded decrees adjudicating accrued rights and those prospective features of a decree" that involve supervision of changing conditions). As the *Ho* plaintiffs represent a subset of the original class of *SFNAACP* plaintiffs, the only issue to be resolved in determining whether *res judicata* bars this claim is whether it represents the "same claim" as that raised in *SFNAACP*. *See Nordhorn*, 9 F.3d at 1404.

■ To determine whether a previous suit encompassed the same claim for *res judicata* purposes, the Court considers the following criteria, the last of which is most important:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the suits involve infringements of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir.1982) (citation and internal quotation marks omitted). The first criterion, whether the rights established in the first action would be destroyed by prosecution of the second action, favors the application of *res judicata* to this claim. It cannot be argued seriously that the rights established in *SFNAACP* would not be impaired if plaintiffs proceeded with this claim. The parties in *SFNAACP* viewed paragraph 13 as essential to eradicating discrimination and segregation in San Francisco public schools. The *Ho* plaintiffs seek to divest children of rights established in the previous suit.

The second criterion, whether the same evidence would be presented in both cases, also dictates for barring the claim. Substantially the same evidence, in the form of data involving system-wide, school-by-school enrollment by race/ethnicity, admissions, acceptances, and the effectiveness of student assignment policies, would be presented to decide the two claims. The third criterion also favors the application of *res judicata*. In a broad sense, *Ho* and *SFNAACP* involve the same right—the right of children to attend public school free of invidious discrimination. *Ho* and *SFNAACP* may reach different conclusions about how to protect the rights of the SFUSD school children, but this is the issue at the heart of both suits.

The last and most important criterion in the "same claim" analysis is whether *Ho* and *SFNAACP* arose out of the same transactional nucleus of facts. *See International Union of Operating Eng'rs–Employers Constr. Indus. Pension, Welfare & Training*

*Trust Funds v. Karr,* 994 F.2d 1426, 1429 (9th Cir.1993). This factor is so important that a court may rely solely on it to hold a second suit barred by the first. *See id.* at 1430.

Assessment in this suit of the Consent Decree's constitutionality when entered would involve precisely the same transactional nucleus of facts (in particular the justification for the SFUSD desegregation plan), and the same time frame, as *SFNAACP.* Indeed, a case previously cited by plaintiffs in opposition to defendants' motion to dismiss, *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 750 F.2d 731 (9th Cir. 1984), *cert. denied,* 474 U.S. 919, 106 S.Ct. 247, 248, 88 L.Ed.2d 256 (1985) (hereinafter "*LANAACP* "), supports this view.

In *LANAACP,* the Ninth Circuit determined the extent to which the doctrine of *res judicata* barred a class action alleging intentional segregation in the Los Angeles public schools. *Id.* at 734. A similar claim had been tried in state court, *Crawford v. Board of Education of City of Los Angeles,* 113 Cal.App.3d 633, 170 Cal.Rptr. 495 (1980), *aff'd,* 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), for actions taken by the school district up to the time of trial, which began in 1968. *See LANAACP,* 750 F.2d at 734. The Ninth Circuit held that *res judicata* applied to the *LANAACP* suit to the extent that plaintiffs challenged actions taken on or before May 2, 1969, when the *Crawford* trial concluded. The court's rationale was that only actions taken before May 2, 1969, came within the scope of the claim litigated in *Crawford. Id.* at 739.

The record shows that the interests of the *Ho* plaintiffs were adequately represented at the time the Consent Decree was entered. The *SFNAACP* plaintiff class consisted of "all children of school age who are, or may in the future become, eligible to attend the public schools of the S.F.U.S.D . . . ." *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 576 F.Supp. 34, 52 (N.D.Cal.1983). As the Court held:

> One speaker at the [fairness] hearing questioned the ability of plaintiffs' counsel

adequately to represent all the racial/ethnic groups comprising the plaintiff class. The Court finds that plaintiffs' counsel throughout the litigation represented the interests of all class members in an exemplary fashion. All of the class members sought as a common objective the complete desegregation of the District, and plaintiffs' counsel has served that common objective well.

*Id.* at 50.

Given the adequacy of representation at the time the Consent Decree was entered, the actions of the original plaintiff class, of which the *Ho* plaintiffs are a subset, binds the latter class.[4] The *SFNAACP* plaintiff class could have chosen not to enter into the Consent Decree; it could have raised constitutional objections to the Consent Decree either at the fairness hearings or by pursuing an appeal. Because they did not raise their constitutional challenge at the time the Consent Decree was entered, or subsequently on appeal, plaintiffs may not raise it now. *See McClain,* 793 F.2d at 1033 (*res judicata* bars grounds for recovery that could have been asserted in prior action); Schwarzer § 10:598. For all these reasons, the Court denies plaintiffs' motion for summary judgment on the issue of the Consent Decree's constitutionality in 1983.

2.

Given this Court's prior ruling that *res judicata* does not apply to bar all of plaintiffs' claims, the more difficult question plaintiffs raise relates to the constitutionality of the Consent Decree at present.

■ At the outset, plaintiffs have shown that they are subject to race-based classification by a state actor. Despite defendants' claim that students engage in self-identification, and that the SFUSD does not engage in classification by race, there can be no genuine dispute of fact on this point. As plaintiffs maintain, race-based classification shifts the burden of proof to defendants to provide a justification for the scheme. This shift in the burden of proof occurs *at trial,* however; it

---

**4.** As the *Ho* plaintiff class is a subset of the original plaintiff class, the *Ho* plaintiffs are in privity with the *SFNAACP* plaintiffs for purposes of this analysis.

does not relieve plaintiffs of their burden, as moving parties on summary judgment, of demonstrating the absence of disputes of material fact on key issues. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553 (where non-moving party bears the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case").

Given the use of racial classifications, the threshold issue for resolution is the appropriate level of constitutional scrutiny. The Supreme Court recently has held that "all racial classifications, imposed by whatever federal, state or local government actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995); *see also Shaw v. Hunt,* —— U.S. ——, ——, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207 (1996) (redistricting plan violated Equal Protection Clause where not narrowly tailored to serve compelling state interest). Defendants argue that because *Adarand,* did not arise in the school desegregation context, its mandate does not apply.[5] As a recent, post–*Adarand,* district court opinion has noted, "[u]ntil the Supreme Court elects to furnish guidance as to the appropriate level of scrutiny to 'race conscious' student enrollment provisions designed to remedy obstinate historical racial discrimination, lower courts will be left to grapple on their own with this thorny problem." *Stanley v. Darlington,* 915 F.Supp. 764, 775 (D.S.C.1996).

For purposes of this Opinion, the Court assumes, without deciding, the appropriateness of strict scrutiny review. Consequently, the Court evaluates the Consent Decree for equal protection purposes in the same manner it would a voluntary affirmative action program. *See Howard v. McLucas,* 871 F.2d 1000, 1006 (11th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989).[6] Because defendants have the burden of justifying their classification scheme, to prevail on summary judgment plaintiffs need only show the absence of a dispute of a material fact, and that they are entitled to judgment as a matter of law, with respect to a single element of the analysis.

■ The first issue raised pursuant to strict scrutiny analysis is whether there exists a compelling state interest that would justify the use of racial classifications. It is clear that a state's interest in remedying the effect of past racial discrimination "may rise to the level of a compelling state interest" justifying the use of racial distinctions. *Shaw,* —— U.S. at ——, 116 S.Ct. at 1902; *see also Wygant v. Jackson Board of Educ.,* 476 U.S. 267, 286, 106 S.Ct. 1842, 1853, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring in part) ("remedying past or present racial discrimination by a state actor is a sufficiently weighty state interest to warrant the remedial use of a carefully constructed affirmative action program"). To pass constitutional muster, however, the past discrimination must be specifically identified, and "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary 'before it embarks on an affirmative-action program.' " *Shaw,* —— U.S. at ——, 116 S.Ct. at 1902 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848).

■ Plaintiffs advance the argument that, in the absence of a judicial finding of past discrimination by the SFUSD prior to the entry of the Consent Decree in 1983, there can be no possible justification for the racial classification imposed on plaintiffs.

**5.** *Adarand* involved a challenge to the constitutionality of a federal program designed to provide highway contractors with incentives to hire disadvantaged business enterprises as subcontractors.

**6.** The State Defendants argue that, under the California Constitution and state laws, strict scrutiny need not be applied to the evaluation of the Consent Decree. Even if the Consent Decree were to pass muster under the California Constitution, however, it would be struck down by virtue of the Supremacy Clause if held to violate the Equal Protection Clause of the Fourteenth Amendment. The State Defendants' reliance on California law, therefore, is misplaced.

The Supreme Court's cases do not so hold. *See, e.g., Wygant,* 476 U.S. at 289, 106 S.Ct. at 1854 (O'Connor, J., concurring in part) ("a contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan," as a constitutional violation "does not arise with the making of a finding; it arises when the wrong is committed"); *Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1565 (11th Cir.1994) ("[a]lthough *Croson [City of Richmond v. Croson,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) ] requires that a public employer show strong evidence of discrimination *when defending* an affirmative action plan, the Supreme Court has never required that, before implementing affirmative action, the employer must have already proved that it has discriminated") (emphasis added); *Crumpton v. Bridgeport Educ. Ass'n,* 993 F.2d 1023 (2d Cir.1993).

*Crumpton* involved a constitutional challenge to the provisions of a consent decree, entered in an earlier school desegregation case, relating to preferences given to minority teachers in making reductions in force. As the Second Circuit noted, "in the instant case there was never a judicial finding that a constitutional violation had occurred precisely because a consent decree resolved the parties' dispute. A carefully worded consent decree can not substitute for a judicial determination." *Id.* at 1029. Because no such judicial determination had been made, the Second Circuit applied strict scrutiny analysis to hold that the consent decree's layoff plan was not sufficiently "narrowly tailored" to withstand constitutional challenge. Prior to reaching this conclusion, however, the court acknowledged that "[r]ectifying past discrimination is unquestionably a compelling governmental interest," and suggested that, in other circumstances, the district court could have made a finding on remand that such discrimination had occurred. *Id.* at 1030; *see also Wygant,* 476 U.S. at 278, 106 S.Ct. at 1849 (plurality opinion).

■ All that the trial court is required to do when assessing constitutionality under strict scrutiny is "make a factual determination that the [state actor] had a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848 (plurality opinion). It is true that, in approving the Consent Decree, this Court did not reach any conclusion on the issues of fact and law underlying the merits of the dispute. *SFNAACP,* 576 F.Supp. at 44. This does not mean, as a matter of law, that there was insufficient evidence to support a finding of past discrimination.[7] To so hold would be to disregard the principle that "voluntary conciliation and settlement are the preferred means of dispute resolution, particularly in complex class action litigation." *San Francisco NAACP,* 576 F.Supp. at 44. Nor does the absence of a prior judicial determination that the SFUSD had a "strong basis in evidence for its conclusion that remedial action was necessary," *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848, mean that the SFUSD had no such basis in evidence.[8] To the contrary, this is a question of fact that can be determined now.

■ Perhaps because of their position that the Court's failure to make findings of past discrimination in 1983 means that for purposes of strict scrutiny analysis no such discrimination existed, plaintiffs have not met their burden of showing the absence of a dispute of material fact on the issue of past discrimination. This is not surprising, as the degree to which the SFUSD engaged in intentional segregation prior to the institution of the Consent Decree is a factual issue no less contested now than it was then.[9]

---

7. Rather, as this Court held, "[a]ll of this is not to say that plaintiffs could not have won their case; the Court has made no effort to discuss all of the relevant evidence adduced by plaintiffs thus far." *San Francisco NAACP,* 576 F.Supp. at 47.

8. As the SFNAACP notes, the parties stipulated in paragraph 8 of the Consent Decree that "if proof were presented in formal proceedings, the Court would be justified in making factual findings and legal conclusions sufficient to require the systemwide remedies that are set forth in this Consent Decree." *San Francisco NAACP,* 576 F.Supp. at 53.

9. In opposing this motion, defendants have adduced, for example, evidence of segregation taken from the findings of this Court and other courts from 1971–1981.

■ The second matter for determination under strict scrutiny analysis is whether the challenged use of racial classifications is "narrowly tailored" to achieve the compelling state interest it is intended to serve. *See Shaw,* — U.S. at —, 116 S.Ct. at 1902. In determining whether remedies based on race are narrowly tailored, "several factors must be considered: necessity for the relief; efficacy of alternative remedies; flexibility and duration of the relief; waiver provisions; relationship of any numerical goals to the relevant [population]; and impact of relief on third parties." *Davis v. City & County of San Francisco,* 890 F.2d 1438, 1447 (9th Cir. 1989) (citing *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066–67, 94 L.Ed.2d 203 (1987)) (consent decree designed to end racial and sexual discrimination and harassment in city fire department did not violate equal protection), *cert. denied,* 498 U.S. 897, 111 S.Ct. 248, 112 L.Ed.2d 206 (1990).

Determining whether a consent decree is sufficiently "narrowly tailored" to achieve its goals and survive strict scrutiny, *see Davis,* 890 F.2d at 1447, rests on factual issues. Rather than pointing to the absence of factual evidence supporting defendants' case, *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553, on the issue whether the Consent Decree is narrowly tailored, however, plaintiffs advance a number of legal arguments to support their position that as a matter of law it is not.

Plaintiffs contend, first, that paragraph 13 of the Consent Decree constitutes a racial balancing scheme unconstitutional under *Croson.* 488 U.S. at 506, 109 S.Ct. at 728. *Croson,* however, holds only that, *on the facts of that case,* a 30 percent quota could not be considered "narrowly tailored." *Id.* at 507, 109 S.Ct. at 729. Next, plaintiffs maintain that certain provisions of the Consent Decree

address matters unrelated to school segregation, such as the achievement of academic excellence, "activism for housing development," and influencing the transfer of students between the SFUSD and other school districts.[10] (Pls.' Mot. at 18–19.) All these provisions, however, relate to activities that the Consent Decree identifies as designed to promote desegregation within the SFUSD. Although matters such as housing development may fall outside the SFUSD's general purview, it cannot be said as a matter of law that the SFUSD's obligations under the Consent Decree go beyond remedying past discrimination. Nor have plaintiffs offered evidence to show that the Consent Decree's stated goal of eliminating racial discrimination in the SFUSD is a pretext, that the Consent Decree is actually being used "'to achieve broader purposes lying beyond the jurisdiction of school authorities.'" *Missouri v. Jenkins,* 515 U.S. 70, —, 115 S.Ct. 2038, 2048, 132 L.Ed.2d 63 (1995) (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 22–23, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971)).

Most important, plaintiffs fail to show the absence of a dispute of fact relating to the "necessity for the relief; efficacy of alternative remedies; flexibility and duration of the relief; waiver provisions; relationship of any numerical goals to the relevant [population]; and impact of relief on third parties." *Davis,* 890 F.2d at 1447. Defendants, by contrast, have provided evidence of the existence of serious disputes of fact on these issues that preclude the granting of summary judgment for plaintiffs on the Consent Decree's constitutionality.[11]

3.

■ Plaintiffs argue in the alternative that even if the Consent Decree were other-

---

**10.** In *Missouri v. Jenkins,* 515 U.S. 70, —, 115 S.Ct. 2038, 2051, 132 L.Ed.2d 63 (1995), the Supreme Court held that, as there had been no finding of an interdistrict violation, a school district's efforts to desegregate by attracting nonminority students from outside the district constituted a means of "accomplish[ing] indirectly what [the court] admittedly lack[ed] the remedial authority to mandate directly: the interdistrict transfer of students." In this case, by contrast, the challenged provisions of the Consent Decree

mandate the *provision of information* to suburban school districts regarding their obligations under state law. Even if state law violates the Constitution, the provision of accurate information regarding the law cannot.

**11.** *See* note 14. Defendants also offer evidence contesting plaintiffs' claim that the *Ho* plaintiff class bears a disproportionate burden, relative to other ethnic groups, under the Consent Decree. (*See, e.g.,* Der Decl.)

wise constitutional, the SFUSD's having complied with its mandates for fourteen years necessitates immediate termination.[12]

Several recent Supreme Court cases have dealt with the propriety of the termination of decrees in the school desegregation context. Although in *Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), the Supreme Court held that "the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed," recent opinions have clarified that "[f]rom the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Board of Educ. of Oklahoma City Pub. Schs. v. Dowell*, 498 U.S. 237, 247, 111 S.Ct. 630, 636, 112 L.Ed.2d 715 (1991) (finding that the district "was being operated in compliance with the commands of the Equal Protection Clause of the Fourteenth Amendment, and that it was unlikely that the Board would return to its former ways, would be a finding that the purposes of the desegregation litigation had been fully achieved").

As the Supreme Court held in *Dowell*:

Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.

*Id.* at 248, 111 S.Ct. at 637 (internal quotation marks omitted). Before terminating such a decree, however, it is the Court's duty to consider whether the traces of *de jure* segregation have been eliminated "as far as practicable," looking to "every facet of school operations—faculty, staff, transportation, extracurricular activities and facilities." *Dowell*, 498 U.S. at 250, 111 S.Ct. at 638 (quot-

ing *Green*, 391 U.S. at 435, 88 S.Ct. at 1693) (internal quotation marks omitted).

In *Freeman v. Pitts*, 503 U.S. 467, 471, 112 S.Ct. 1430, 1435, 118 L.Ed.2d 108 (1992), decided the year after *Dowell*, the Supreme Court held that "a district court need not retain active control over every aspect of school administration until a school district has demonstrated unitary status in all facets of its system." Rather, the Court explained, "[p]artial relinquishment of judicial control, *where justified by the facts of the case*, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities." *Id.* at 489, 112 S.Ct. at 1444 (emphasis added). The opinion reiterated that "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the constitutional violation," and the scope of the remedy is determined by the nature of the violation. *Id.* Factors to be considered by the court in ordering a partial withdrawal of control are the following:

whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and [3] whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Id.* at 491, 112 S.Ct. at 1446.

In *Jenkins*, 515 U.S. at 100, 115 S.Ct. at 2055, the Supreme Court reaffirmed Freeman's three-part test. It held that the "ultimate inquiry" in determining whether to terminate a decree, either in whole or in part, is "whether the [constitutional violator] ha[s] complied in good faith with the desegregation

---

**12.** As plaintiffs by their motion seek to dissolve or terminate the entire Consent Decree rather than to modify it, the Court does not address at this time the propriety of modification under *Rufo v. Inmates of Suffolk County Jail*, 502 U.S.

367, 383, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992) (party seeking modification of consent decree must show significant change in facts or law).

decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." *Id.* at 89, 115 S.Ct. at 2049 (quoting *Dowell,* 498 U.S. at 249–50, 111 S.Ct. at 638). The Court also reiterated the importance of returning school districts to local control as soon as the school system is operating in compliance with the Constitution. *See id.* at 98–99, 102–03, 115 S.Ct. at 2054, 2056.

 Even were these cases directly on point, which they are not, plaintiffs have failed to demonstrate the absence of a genuine dispute of material fact, and that they are entitled to judgment as a matter of law, on the issue of termination.[13] As the Supreme Court held in *Freeman,* "[p]roper resolution of any desegregation case turns on a careful assessment of its *facts.*" 503 U.S. at 474, 112 S.Ct. at 1437 (emphasis added) (citation omitted). Although plaintiffs offer evidence tending to show that the SFUSD has complied substantially with the Consent Decree in a number of respects, their own evidence tends to show a failure of compliance in other respects.[14]

Even if there were undisputed evidence of compliance in specific areas, partial termination of judicial control would not be justified on a motion for summary judgment unless plaintiffs could show the absence of disputes of material fact with respect to *all three parts* of *Freeman*'s three-part test, including "whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system." 503 U.S. at 491, 112 S.Ct. at 1446. Plaintiffs have not done so. Accordingly, with respect to termination of

the Consent Decree, summary judgment for plaintiffs is denied.[15]

### III.

Accordingly,

IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment is DENIED.

---

13. What distinguishes the factual posture of this case from that of the authorities cited is that *Ho* involves a consent decree rather than a court desegregation order, and the party moving to terminate is not the school district but a subclass of students.

14. Desegregation Report No. 12 (1995), offered as evidence by plaintiffs, reveals, for example, that a number of schools are out of compliance with the 45 percent and 40 percent caps; that a disproportionate number of African–American students are placed in Special Education classes; that, until recently, African-American students were placed in bilingual classes for disciplinary reasons; that the school district has been slow to

hire minority teachers; and that African–American and Latino students perform the worst of any group on the California Test of Basic Skills. (*See* Girard Decl., Ex. D.)

15. Plaintiffs' concern that the Consent Decree will continue in perpetuity if they do not prevail in this litigation is unfounded. The Court is aware both of its constitutional obligations and of the Eleventh Circuit's decision in *United States v. Miami,* 2 F.3d 1497, 1506 (11th Cir.1993), which held that a district court need not await a party's motion to terminate a consent decree, but may do so *sua sponte.*