DANNY J. BOGGS, Circuit Judge,
dissenting.
In 1848, the relevant local authority, the Boston School Board, decided that race should be used in making assignments in the Boston public schools. See Roberts v. City of Boston, 59 Mass. 198, 208-09 (1849). They excluded and segregated black students. However, in 1855 the ultimate political authority, the legislature of Massachusetts, established the general principle against racial discrimination in educational choices.[1] The legislature was lauded for that choice. See generally J. Morgan Kousser, “The Supremacy of Equal Rights”: The Struggle against Racial Discrimination in Antebellum Massachusetts and the Foundations of the Fourteenth Amendment, 82 Nw. U.L. Rev. 941, 943 & nn. 8-9 (1988).
Over 100 years later, various Michigan local and subordinate state authorities began to implement policies of racial discrimination in decisions on, inter alia, educational admissions. The Supreme Court of the United States held that such actions were permissible, but certainly not that they were compelled. Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Subsequently, the ultimate state political authority, the People of Michigan, voted to establish the same prin *492 ciple that Massachusetts did in 1855.[2] This is the same principle embodied in President Kennedy’s Executive Order 10925 of 1961 — that governmental decisions should be undertaken “without regard to race, creed, color or national origin.” 26 Fed. Reg. 1977, sec. 801(1) (Mar. 8, 1961). Indeed, the very term “affirmative action” comes from that presidential order.[3]
The majority of the en banc court now holds that this action of the People of Michigan was unconstitutional, relying on an extreme extension of two United States Supreme Court cases ruling on very different circumstances.
To begin with, those two cases each involved a single action that transferred, for the first time, decision making on a single matter, a transfer held to be wholly aimed at one disadvantaged race. In one instance, approval of new anti-discrimination ordinances was moved from the city council to the voters of the city of Akron, and in the other case, power over certain pupil assignment policies was moved from the citizens of one city in the state of Washington to the citizens of the entire state.
In our case, however, we have the citizens of the entire state establishing a principle that would in general have seemed laudable. Even plaintiffs here do not allege, in the context of their political-process argument, that if this constitutional provision had been enacted at some earlier time in Michigan, for example upon its entry into the union, or upon the enaetment of its new constitution in 1963, that it would have been unconstitutional. They instead contend that because of current circumstances, and intervening political decisions of racial discrimination, these Supreme Court cases make the principled action of the People of Michigan unconstitutional.
Indeed, the majority seems to concede that some set of decision makers in Michigan would be able to reverse the policies that they claim are immune from actions by the entire body politic. Rather, they demand that any changes in the educational (and perhaps employment) policies here can be enacted only by individual actions of each of the university governing authorities (three of which are chosen by statewide election over eight years, Mich. Const, art. VIII § 5), each regional state university (whose governing boards are appointed on a staggered basis by the governor over eight years, id. § 6), and each local educational authority for community and technical schools (whose governing authorities are chosen by a variety of methods by each individual county and locality, id. § 7).
Thus, plaintiffs here contend that a citizen or student, whether from the Upper Peninsula or the city of Detroit, or from another state, who wants to pursue educational and employment opportunities in Michigan free from racial discrimination, must contest and succeed, one-by-one, in elections or selections in all of the many individual jurisdictions and methods of selection.
*493 To simply state this proposition is to show how far afield this situation is from even the most generous interpretation of the Hunter and Seattle cases.
In addition, the situation in Michigan, in which the various local authorities are permitted (under Grutter) to engage in varieties of racial discrimination, both for and against variously defined groups, is wholly at odds with the single-instance restructuring of government involved in the Supreme Court precedents relied on by the majority-
Here, it was clear from the evidence in the Grutter case, and in the record in this case, discrimination may be practiced in favor of certain racially or ethnically defined minorities, primarily African-Americans (or perhaps those deemed to be “black,” whether or not actually “American”) or “Hispanics” (although there was some evidence that some groups generally defined as “Hispanic” (especially Cuban) might be discriminated against rather than in favor of, see Deposition of Allan Stillwagon, pp. 358-59, cited in Grutter, 539 U.S. at 393, 123 S.Ct. 2325 (Kennedy, J., dissenting)). On the other hand, various groups, sometimes defined as racial minorities, may be discriminated against. See Ho v. S.F. Unified Sch. Dist., 965 F.Supp. 1316 (N.D.Cal.1997) (Chinese); St. Francis Coll. v. Al-Khazraji, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (Arabs); Shaare Tefila Congregation v. Cobb, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987) (Jews).
Under these circumstances, holding it to be a violation of equal protection for the ultimate political authority to declare a uniform policy of non-discrimination is vastly far afield from the Supreme Court precedents.
I give the following example which is not fanciful in today’s changing society. A child might be born who would, in today’s conventional terms, be held to be one-half Chinese, one-fourth Eastern-European Jewish, one-eighth Hispanic (Cuban), and one-eighth general North European, mostly Scots-Irish. Under those circumstances, if that child or its parents wished it to compete for educational or employment opportunities in Michigan without discrimination for or against the child, however a bureaucrat might classify the child, the majority’s position is that they could do so only by proceeding in a large number of individual political and election campaigns across the length and breadth of Michigan, rather than by, as was the case here, convincing voters of Michigan to enact a policy that would under most other circumstances have been held to be laudable.
I cannot agree that this decision is correct, either as a matter of general constitutional law or as an accurate interpretation of the Supreme Court precedents. I therefore respectfully DISSENT.

. "In determining the qualifications of scholars to be admitted into any public school or any district school in this Commonwealth, no distinction shall be made on account of the race, color or religious opinions, of the applicant or scholar.” 1855 Mass. Acts ch. 256.

. "The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.” Mich. Const, art. I, § 26.

. "The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin.” Ibid.